Marcella LANDELL, et al., Plaintiffs,
Neil Randall, et al., Plaintiffs, and
Vermont Republican State Commit-
tee, Plaintiff,

v.

William H. SORRELL, et al., Defen-
dants, and Vermont Public Interest
Research Group, et al., Defendant–In-
tervenors.

No. 2:99–CV–146.

United States District Court,
D. Vermont.

Aug. 11, 2000.

As Amended Aug. 28, 2000.

James Bopp, Jr., James R. Mason, III, Heidi K. Meyer, Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, Norman Charles Smith, Meyers & Smith, Essex Junction, VT, for Marcella Landell, Vermont Republican State Committee, plaintiffs.

James Bopp, Jr., James R. Mason, III, Heidi K. Meyer, Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, Norman Charles Smith, Meyers & Smith, Essex Junction, VT, for Donald R. Brunelle, plaintiff.

Joshua Ross Diamond, Diamond & Robinson, Montpelier, VT, Peter Forbes Langrock, Mitchell Lloyd Pearl, Langrock, Sperry & Wool, Middlebury, VT, David

Seth Putter, Law Offices of David Putter, Montpelier, VT, Melanie McNeill Kehne, Primmer & Piper, P.C., Montpelier, VT, Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, Mark Lopez, American Civil Liberties Union, New York City, for Neil Randall, George Kuusela, Steve Howard, Jeffrey A. Nelson, John Patch, Vermont Libertarian Party, plaintiffs.

Timothy Bert Tomasi, Office of the Attorney General, Montpelier, VT, Eve Rebekah Jacobs–Carnahan, Montpelier, VT, for William H. Sorrell, in his official capacity as Vermont Attorney General, defendants.

Peter Francis Welch, Welch, Graham & Manby, White River Jct, VT, John C. Bonifaz, Brenda Wright, Gregory G. Luke, Bonita P. Tenneriello, National Voting Rights Institute, Boston, MA, for intervenors-defendants..

### ORDER AND OPINION

SESSIONS, District Judge.

This is a constitutional challenge to the 1997 Vermont Campaign Finance Reform Act ("Act 64"), codified at Vt.Stat.Ann. tit. 17, Chapter 59 §§ 2801–2883. Plaintiffs seek declaratory and injunctive relief under Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the First and Fourteenth Amendments of the United States Constitution. U.S.C.A. Const. Amends. 1 and 14. Plaintiffs argue that certain provisions of Act 64 violate their First Amendment free speech and association rights and do not serve compelling state interests. The challenged provisions of Act 64 are as follows:

Section 2801(2) defines "contribution" as "a payment, distribution, advance, deposit, loan, or gift of money or anything of value, paid or promised to be paid to a person for the purpose of influencing an election." Vt.Stat.Ann. tit. 17, 2801(1).

Section 2801(5) defines "political party" as "a political party organized under chapter 45[1] of this title or any committee established, financed, maintained or controlled by the party, including any subsidiary, branch or local unit thereof and including national or regional affiliates of the party." Vt.Stat.Ann. tit. 17, § 2801(5). The Secretary of State's Office has interpreted Section 2801(5), in conjunction with chapter 45, to mean that town, county, and state committees are a single entity for the purposes of Act 64's campaign contribution limits.[2]

Sections 2805(a) and (b) limit contributions to candidates for Vermont office in a two-year election cycle to $200 for state representative, $300 for state senator, and $400 for governor, lieutenant governor, secretary of state, state treasurer, state auditor, and state attorney general. Contributions from a single source, political party, or political committee to political committees or political parties are limited to $2000. Vt.Stat.Ann. tit. 17, §§ 2805(a) and (b).

Section 2805(c) limits out-of-state contributions to 25% of a candidates' total contributions. Vt.Stat.Ann. tit. 17, § 2805(c).

Section 2805(f) states that the individual contribution limits do not apply to the candidate herself or to her immediate family. Immediate family is defined as "individuals related to the candidate in the first, second or third degree of consanguinity." Vt.Stat.Ann. tit. 17, § 2805(f).

Section 2805a(a) limits candidate expenditures in any given two-year election cycle to $300,000 for governor; $100,000 for lieutenant governor; $45,000 for secretary of state, attorney general, treasurer, and auditor; $4,000 for state senator plus $2,500 for each additional seat in the relevant jurisdiction; and $2,000 for state representative in a single-member district and

---

**1.** Chapter 45 (Political Parties), Vt.Stat.Ann. tit. 17, §§ 2301 through 2320, sets forth the rules for creating and operating town, county, and state political parties.

**2.** Letter of David Grayck, Deputy Secretary of State, May 18, 1999.

$3,000 for state representative in two-member districts. Vt.Stat.Ann. tit. 17, § 2805a(a).

Sections 2809(a) and (b) provide that related campaign expenditures made on a candidate's behalf shall be considered a contribution to the candidate and, if the related expenditure is over $50, it will also count as an expenditure by that candidate. Vt.Stat.Ann. tit. 17, § 2809(a) and (b).

Section 2809(c) states that an expenditure made by a third-party individual is considered a "related expenditure" made on behalf of a candidate or group of candidates if it is "intended to promote the election of a specific candidate or group of candidates, or the defeat of an opposing candidate or group of candidates," and is "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee." Vt.Stat.Ann. tit. 17, § 2809(c).

Section 2809(d) states that an expenditure made by a political party or by a political committee that primarily benefits six or fewer candidates who are associated with the party or committee triggers a presumption that it is a related expenditure. Vt.Stat.Ann. tit. 17, § 2809(d). The Administrative Rule promulgated by the Secretary of State pursuant to the authority granted in Section 2809(f) states that the presumption is rebuttable by appropriate evidence showing that the expenditure was not intentionally facilitated, solicited, or approved by the candidate. Vermont Secretary of State, Administrative Rule 2000-1(3)(d).

This case results from the consolidation of three separate civil actions: On May 18, 1999, Plaintiffs Marcella Landell, Donald Brunelle, and the Vermont Right to Life Committee, Inc., Political Committee sued Vermont Attorney General William H. Sorrell and Vermont's 14 States Attorneys. Plaintiffs alleged that Act 64 violated their First Amendment freedoms of speech and association (99–CV–146, Paper 1) (hereinafter *"Landell"*). On August 13, 1999, Plaintiffs Neil Randall, George Kuusela,

Steve Howard, Jeffrey Nelson, John Patch, and the Vermont Libertarian Party brought essentially the same suit (99–CV–234, Paper 1) ("hereinafter *Randall* "). On October 25, 1999 this case was consolidated with *Landell* (99–CV–234, Paper 13). On February 15, 2000, Plaintiff Vermont Republican State Committee sued on similar grounds, but also raised a challenge to Act 64's application to political parties and committees (00–CV–57, Paper 1) (hereinafter *"VRSC"*). On March 21, 2000 the case was consolidated with *Landell* (Paper 28).

The Vermont Public Interest Research Group, The League of Women Voters of Vermont, Rural Vermont, Vermont Older Women's League, Vermont Alliance of Conservation Voters, Mike Fiorello, Marion Gray, Phil Hoff, Frank Huard, Karen Kitzmiller, Marion Milne, Daryl Pillsbury, Elizabeth Ready, Nancy Rice, Cheryl Rivers, Maria Thompson (collectively "Defendant–Intervenors") successfully moved to intervene in all three of the above cases. Court Orders granting motions: *Landell,* September 27, 1999 (Paper 27); *Randall,* October 25, 1999 (Paper 13); *VRSC,* March 21, 2000 (Paper 28).

For reasons set forth below, this Court finds Act 64 constitutional in part and unconstitutional in part. Specifically, the Court rules as follows:

1) Act 64's contribution limits, Vt.Stat. Ann. tit. 17, § 2805(a)–(b), as they pertain to contributions from individuals, survive the test imposed upon such limits by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and are therefore constitutional.

2) Act 64's expenditure limits, Vt.Stat. Ann. tit. 17, § 2805a(a), although supported by numerous important government interests such as minimizing the reality and appearance of corruption, stemming the manipulative practice of bundling, increasing candidate-voter contact, and inspiring participation in the electoral process, nevertheless are an un-

precedented and impermissible extension of *Buckley*. The limits are unconstitutional.

3) Act 64's 25% limit on out-of-state funds, Vt.Stat.Ann. tit. 17, § 2805(c), violates candidates' and contributors' First Amendment rights of free speech and association, and is therefore unconstitutional.

4) Act 64's $2000 limit on contributions to political parties, Vt.Stat.Ann. tit. 17, § 2805(a)–(b), is constitutional. However, the limit on contributions *from* political parties to candidates, codified at same, while not *per se* unconstitutional, is unconstitutionally low. Additionally, Act 64's definition of state and local parties as one entity pursuant to Vt.Stat.Ann. tit. 17, §§ 2801(5), and 2301 through 2320, and the May 18, 1999 letter from the Deputy Secretary of State, is constitutional.

5) Act 64's $2,000 limit on contributions to political committees, and its various limits on contributions by political committees to candidates, Vt.Stat.Ann. tit. 17, § 2805(a)–(b), is constitutional.

6) Act 64's regulation of related expenditures, Vt.Stat.Ann. tit. 17, § 2809(a)–(c), is constitutional as it relates to candidate contributions, but unconstitutional as it relates to candidate expenditures. Additionally, Section 2809(d)'s establishment of a rebuttable presumption that an expenditure by a political party or political committee is related if it benefits six or fewer candidates, as clarified by the Secretary of State, is constitutional.

**3.** After two statewide referenda votes, the Vermont Legislature adopted direct primary elections. The law also included a corrupt practices act that mandated public disclosure after the primary of candidate expenditures, including expenditures on the candidate's behalf. 1915 Vt.Laws 4, § 22; 1916 Vt.Laws (Sp.Sess.) 4, § 1.

**4.** Vermont adopted limits on campaign spending in primaries. 1961 Vt.Laws 178. Primary elections were of the utmost importance in the Republican-controlled state. The law limited spending to $7,500 for every can-

## I. FACTUAL BACKGROUND

It should be noted at the outset of this section that the constitutionality of some provisions of Act 64 depends heavily on facts, while the constitutionality of others does not. The constitutionality of those sections that do hinge on facts depends in large part on whether the legislature was correct in perceiving that there was public concern about corruption in campaign financing, and whether the legislature's responses—i.e., the provisions of the Act—were properly tailored to address that perceived concern. As to the former criterion, the quality and quantity of evidence considered by the legislature, as well as the atmosphere of public concern leading to the Act's creation, are of central importance to this Court's rulings. Therefore, a substantial amount of background concerning the history of campaign finance regulation in Vermont, and the debate at the time of the passage of Act 64, is included in the facts section below.

### A. The History of Campaign Finance Regulation in Vermont.

Efforts to regulate campaign finance in Vermont are certainly not new; nor is public concern about the issue. Over the last nine decades the Vermont Legislature has responded numerous times to public concern about the inappropriate influence of money in politics by passing laws limiting contributions and expenditures, as well as compelling disclosure of campaign finances. Pre–*Buckley* laws to that effect were passed in 1916,[3] 1961,[4] and 1971.[5]

didate for state office. It prohibited outside contributions toward the cost of media advertising without the candidate's consent, and provided that any such contributions would count toward the candidate's spending limit.

**5.** Spending limits were increased and applied to the general election as well. 1971 Vt.Laws 259. These limits were supplemented with contribution limits of $1000 "from a single source, except a contribution from a political party." Contributions from political parties remained unlimited, but there was a $1000 limit on contributions to parties.

In 1976 the Supreme Court decided its landmark political speech case *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). The Court upheld limits on large contributions as necessary to further the compelling state purpose of preventing actual or perceived *quid pro quo* corruption in electoral politics, but struck down the spending limits as impermissible direct restraints on protected speech. As a result of *Buckley*, Vermont repealed its spending limits but maintained its contribution limits. 1975 Vt.Laws (Adj.Sess.) 188.

By the time the legislature prepared to revise the law in 1997 the limits on contributions to candidates varied according to the type of contributor. Individuals, corporations, and labor unions were limited to contributing $1,000 to a candidate in any election. Political committees were limited to contributing $3,000 to a candidate in any election. Political committees were defined as groups "not including a political party" that received contributions or made expenditures "for the purpose of supporting or opposing one or more candidates or affecting the outcome of an election." Former Vt.Stat.Ann. tit. 17, § 2801(4). These same limits applied to contributions to political committees. Political parties were not subject to any limits on making or receiving contributions.

From 1993 to 1998 there existed a rule by which candidates could voluntarily sign an affidavit to limit spending to the amounts that were in place pre-*Buckley*. Former Vt.Stat.Ann. tit. 17, §§ 2841–2842. With each election cycle, however, adherence to the limits plummeted, from 85% to 90% adherence the first year, to under 20% the second year, then quickly to less than 10% adherence. In 1998, no candidates for statewide office signed the affidavit.

---

6. Christopher Graff, *Money Changes Opinions*, Burlington Free Press, April 27, 1997, at 6E.

## B. Publicity Leading Up To the Passage of Act 64.

Throughout the 1990's there was a well recognized mounting concern about the corrupting effect of money in politics. Public officials recognized the problem and were calling for change. In 1991, Vermont's Secretary of State, Republican James Douglas spoke out in favor of stronger campaign finance regulation, noting that the need to raise large amounts of money for campaigns had heightened public suspicion of *quid pro quo* deals being struck between big money contributors and candidates. In 1997 Governor Howard Dean said in an address to the Vermont General Assembly, "money does buy access, and we're kidding ourselves and Vermonters if we deny it." Dean's comment, admirably candid, accelerated public discussion of the matter around the state.

Dozens of newspaper articles reflected the high level of citizen concern over the extent of money's influence over politics. While much of the coverage is anecdotal and thus is not persuasive evidence of actual corruption, it does nevertheless demonstrate the attention these issues received in Vermont and conveys the type of pressure that legislators must have felt to react. Such media coverage is therefore pertinent to understanding the decisions of the General Assembly. Papers reported on:

- State politicians' concern with the influence of money on Vermont politics: Senator Jeb Spaulding reportedly stated, "[t]he evidence is all around us that money is a negative influence on the impartial ordering of priorities and passage or failure of bills around here."[6] Senate President Pro Tem Peter Shumlin allegedly opined, "[t]here's no question (money) buys access to the system.... In my view, it adversely influences a citizen legislature and elections for that matter."[7]

---

7. Ross Sneyd, *Politicians Line Up Behind Campaign Finance Reform*, Rutland Herald, Tuesday, April 8, 1997, at ____.

- The apparent coerciveness of specific contributions: When slate companies contributed to legislators on a study panel considering environmental regulation of the slate industry, one columnist commented, "it's hard to top this for blindness to appearances and propriety."[8] Regarding donations from tobacco companies, one commentator noted that "it's disturbing that Republican lawmakers, armed with $25,450 in donations from tobacco giant Philip Morris, weakened an anti-smoking bill in the final hours of the 1997 session."[9] Reports also described allegations that Governor Dean vetoed a pharmacy bill after collecting $6,000 in campaign contributions from drug companies.[10] State Treasurer Paul W. Ruse was "criticized for financing his campaign with contributions from Wall Street firms with which the state does business."[11] Another article stated that "Ruse even appeared in a magazine advertisement for an investment firm."[12]

- The influence of out-of-state donations: "Outside money is one of Howard Dean's specialties. Of the $312,290 the governor raised for his 1996 election, 65 percent came from out-of-state contributors: labor unions, Washington lawyer-lobbyists, the health care industry, to name a few of the special interests."[13] For the 1994 election "Dean, for example, received more money from major pharmaceutical manufacturers during the reporting period ($11,000) than he did from

people and companies located in Burlington ($10,460)."[14] One editorial said, "it's no mystery why out-of-state contributors pumped hundreds of thousands of dollars into Vermont campaigns.... They're trying to buy influence. But the cost is public trust."[15]

- The Vermont Attorney General's probe into the state Democratic Party's fundraising practices during the 1996 elections: The investigation centered on "whether some of the ... campaigns violated Vermont law by failing to report big expenditures" by the state party and "whether those expenditures threw some of the candidates over the limits they had voluntarily agreed to impose on themselves."[16]

- The large amount of special interest money flowing to candidates in the 1996 elections: An editorial observed that PAC money dilutes the influence of Vermont voters: "[n]o doubt the phones are ringing for these PACs and political committees as they buy access. But what about the Fairfield dairy farmer ... who can't write the big checks?"[17]

## C. Legislative Hearings on Act 64.

In drafting Act 64, the various committees that considered the Act conducted more than 65 hearings at which more than 145 witnesses testified. Much of the testimony heard was anecdote and personal

8. John S. Rosenberg, *Dishonor Roll*, Vermont Magazine, Jan, Feb. 1995, at 21.

9. Editorial, *Democratic process relies on reform*, Burlington Free Press, October 6, 1997, at 6A.

10. Bryan Pfeiffer, *Dean Angry About Pharmacy Veto Criticism, News Story*, Rutland Herald, June 16, 1994, at 11.

11. Chris Graf, *Treasurer Won't Run: Surprise Intended to Thwart Auditor*, Burlington Free Press, July 20, 1994, at 1B.

12. Editorial, *With Ruse Stepping Out, Amestoy Must Step In*, Burlington Free Press, July 20, 1994, at 6A.

13. Bryan Pfeiffer, *Some Big Donors To Vt. Democrats Lacked State Ties*, Rutland Herald, May 4, 1997, at 1.

14. Bryan Pfeiffer, *Governor Doesn't Like the System, But He's Good at It*, Rutland Herald, August 25, 1994, at 1.

15. Editorial, *No Sale*, Burlington Free Press, November 9, 1996. at 10A.

16. David Gram, *Democratic Senate Fund Raising Probed*, Burlington Free Press, Tuesday, April 29, 1997, at 1B.

17. Editorial, *Paying for Power*, Burlington Free Press, October 17, 1996, at 12A.

opinion. Few witnesses, if any, testified against the bill. Among the evidence considered by the legislature were the following:

- Campaign finance summaries for numerous races including various Senate, House, and statewide races from 1978 through 1996.

- Evidence concerning spending and contribution patterns in Vermont's past elections.

- Testimony and data on the cost of campaigning, including cost of travel,· staff, materials, mailings, phone calls, TV and radio ads.

- Testimony on manipulative financing practices such as bundling, through which special interests directed concentrated donations to candidates.

- Testimony concerning the pressures to raise funds: Senator Peter Shumlin testified that the time he spent raising funds prior to the 1996 elections "was one of the most distasteful things that I've had to do in public service."[18]

- Data on former campaign finance laws in Vermont and their efficacy. In particular, the legislature considered the dwindling adherence to voluntary spending limits in the 90's.

- Citizen polls concerning what constitutes an excessively large and/or suspicious donation. According to a 1995 Vermonter Poll, 69% of the respondents agreed that "A $100 limit on private donations will help make government more responsive to the needs of all people."

- Testimony about how particular bills were pushed or killed in committee based in part on the need of some powerful legislators to act in accordance with the wishes of big donors.

- Testimony about the constitutionally valid contribution limits set in Maine.

---

18. Senate Committee on Government Operations Hearing on Campaign Finance, Febru-

## D. The Process by which Act 64 Became Law.

During the 1997 Legislative Session, three separate bills dealing with campaign finance reform were introduced in the Assembly. Each bill enjoyed widespread bipartisan support.

S.69, "An Act Relating to Public Financing of Campaigns and Limitations on Expenditures," was co-sponsored by 20 senators including the Senate's Republican Assistant Minority Leader, and the President Pro Tem of the Senate. S.137, "An Act Relating to the Regulation of Independent Expenditure in Political Campaigns," was also introduced in the Senate by Republicans and Democrats together. Of the 30 members of the Senate, 25 sponsored at least one campaign finance reform bill during the 1997 session. H.28, "An Act Relating to Public Financing of Election Campaigns," was co-sponsored by Representatives Karen Kitzmiller (D) and Marion Milne (R) in the House. After analysis and consolidation of these three bills, H.28 became the vehicle through which the campaign reform provisions were enacted.

Speaking in support of the passage of H.28, Representative Milne noted that H.28 was supported by Governor Howard Dean (D), Speaker of the House Michael Obuchowski (D), past and present Attorneys General Jeffrey Amestoy (R) (now Chief Justice of the Vermont Supreme Court) and William Sorrell (D), and Secretary of State James Milne (R).

Support was strongly bipartisan for the June 12, 1997 Joint Conference Committee Report on H.28; the House adopted the Report 121 to 17, with 37 House Republicans voting for it. The Senate adopted the Report by a vote of 20 to 9, with four Republican Senators voting in favor. On June 26, 1997 Governor Howard Dean signed H.28 into law as Act 64.

ary 4, 1997.

### E. Official Legislative Findings and Intent Supporting Act 64.

After concluding its research and deliberation of campaign finance in Vermont, the General Assembly published extensive findings to support Act 64. The General Assembly found, in relevant part, that:

- Elections were becoming too expensive, and as a result many Vermonters were financially unable to seek election to public office. Furthermore, candidates for statewide office were spending inordinate amounts of time raising campaign funds. Finding (a)(1).

- Some candidates and elected officials respond to contributors who make large contributions in preference to those who make small ones. Finding (a)(2).

- Contributions larger than the amounts specified in this act are considered to be large contributions. Finding (a)(3).

- Robust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have increased. Finding (a)(4).

- Limiting large contributions, particularly from out-of-state political committees or corporations, and limiting campaign expenditures will encourage direct and small-group contact between candidates and the electorate and will encourage the personal involvement of a large number of citizens in campaigns, both of which are crucial to public confidence and the robust debate of issues. Finding (a)(8).

- Large contributions and large expenditures by persons or committees, other than the candidate and particularly from out-of-state political committees or corporations, reduce public confidence in the electoral process and increase the appearance that candidates and elected officials will not act in the best interests of Vermont citizens. Finding (a)(9).

- Citizen interest, participation and confidence in the electoral process is lessened by excessively long and expensive campaigns. Finding (a)(10).

- Campaign expenditures by persons who are not candidates have been increasing and public confidence is eroded when substantial amounts of such money are expended, particularly during the final days of a campaign. Finding (a)(13).

- Act 64 was necessary in order to implement Article 8 of Chapter I of the Vermont Constitution which declares "[t]hat all elections ought to be free and without corruption, and that all voters, having a sufficient, evident, common interest with, and attachment to the community, have a right to elect officers, and be elected into office, agreeably to the regulations made in this constitution." Finding (b).

### F. Evidence At Trial

A ten day bench trial took place between May 8, 2000 and June 2, 2000 to gather facts in this matter. The Court has separated findings from that trial into two principal categories below: the state's proffered justifications for enacting the law, and the likely effect the law will have on political campaigns in Vermont.

#### 1. Evidence of Compelling Governmental Interests Supporting Act 64

Evidence at trial overwhelmingly demonstrated that the Vermont public is suspicious about the effect of big-money influence over politics and that voter apathy is on the rise. Furthermore, it appears they have reason to feel that way. The record suggested that large contributors often have an undue influence over the legislative agenda, and that the need to solicit money from large donors at times turns legislators away from their official duties. Evidence supporting these conclusions came from both Plaintiffs and Defendants in the form of public perception, legislator perception, and expert opinion.

##### a. Erosion of Public Confidence.

Large contributions to candidates have undermined public confidence in Vermont's

political system. On behalf of Defendants, Senator Elizabeth Ready (D), as well as Progressive gubernatorial candidate Anthony Pollina, testified at length to their observations of the waning interest of the public in participating in political and electoral matters. They based their opinions both on personal experience with voters and what they perceived to be public response to media coverage of finance controversies such as the tobacco, slate quarry, and pharmaceutical incidents discussed above.

Plaintiffs' witnesses likewise acknowledged the deterioration of public confidence. Gubernatorial candidate William Meub (R) testified that unlimited contributions have given rise to a perception of impropriety, that voters have become cynical, and that in Vermont there was, in his opinion, a general distrust of elected officials. Former Representative Steve Howard (D) testified that in order to restore public confidence in campaign funding, he had proposed to the Democratic Party that it refuse donations from corporations and lobbyists. Plaintiffs John Patch and Neill Randall also agreed that in the opinion of Vermont voters large contributions raise the appearance of corruption.

The record also demonstrates that the public feels that Vermont's major political parties are heavily influenced, if not controlled, by a few large donors. In the most recent election cycle, political parties in Vermont received substantial amounts of money from sources contributing over $2,000. These contributions came from a small number of donors, yet constituted significant portions of the parties' revenue. In 1998, the Vermont Democratic Party received over $520,000, amounting to 66% of its revenue from just 43 contributors. The Vermont Republican Party received over $300,000, more than 46% of its revenue, from 39 donors.

Statistical evidence supplied by experts buttressed this testimony about deteriorating public confidence. Pollster and analyst Celinda Lake found that 74% of Vermont voters feel that ordinary voters do not have enough influence over politics and government in Vermont; 71% believe that corporations have too much influence; and 70% believe that wealthy individuals have too much influence.

b. Actual and perceived influence of large contributions on legislators.

There is reason to believe that large campaign contributions have, at times, had an improper influence on Vermont legislators themselves. Senator Cheryl Rivers testified that in her experience, consideration of large donor concerns frequently shapes the legislative agenda in Montpelier and often determines whether a bill will get enough support from Senate leadership and committee members to move forward. Senator Rivers further testified that the pressure for parties to raise money makes it increasingly difficult to pursue legislative initiatives contrary to the wishes of interest groups that give large contributions to the state party. As part of a Democratic leadership team, Rivers herself had been asked, contrary to her wishes, to solicit potential donors. She was assigned to call companies such as Electronic Data Systems ("EDS"), a company that is not located in her district and that she would have no reason to contact apart from the need for donations to the party. Senator Rivers insists such practices raise legitimate concerns about undue influence over the legislative agenda.

Expert testimony confirmed that large campaign contributions create the appearance of corruption to the public and affect legislators' voting behavior. Professor Thomas Stratmann testified, based on his own empirical studies, that there is strong evidence that campaign contributions affect legislator behavior. *See, e.g.,* Stratmann, *What Do Campaign Contributions Buy? Deciphering Causal Effects of Money and Votes.* (Defendants' Exhibit xx–1, location of publication unclear from exhibit). Plaintiffs' expert Dr. John Lott conceded in a letter to Plaintiffs' counsel sum-

marizing his opinion of Act 64 that "[t]he more favors government has to give out, the more resources that people will spend to obtain those favors." Plaintiffs' Exhibit 1, at 3.

As a result of the legislature's vulnerability to the demands of large contributors, the Vermont public perceives, legitimately, that candidates frequently spend an excessive amount of time fundraising and not enough time interacting with voters.

### c. Public Suspicion About Out–Of–State Money.

Large contributions from out-of-state donors have raised suspicions of undue influence in the Vermont public. Plaintiff John Patch testified that a large contribution from an out-of-state corporation could raise suspicions of attempted influence. Similarly, Plaintiff Neil Randall testified that if all of his campaign contributions were to come from out of state it might raise questions about his loyalties. Plaintiff Donald Brunelle stated that he would not want to solicit contributions from outside Vermont. "I would not personally believe that's where I want to get my contributions from. I don't want to be a— a state Senator for California for example." He stated that if he received out-of-state contributions, he would feel like he represented those contributors, and that he had to serve their interests.

By and large, however, the specific out-of-state contributions which Defendants presented during the trial as troubling to the public, and those which were portrayed as suspicious in the media, were also large contributions, and often came from PACs. No evidence was offered that specifically showed how the "out-of-state" factor was what in fact led to actual or perceived corruption. There was also no evidence at trial to suggest that contributions from

out-of-state sources were any more or less corrupting than those from in-state sources. Non–Vermonters such as second homeowners and those interested in regional matters such as the Northeast Dairy Compact may have legitimate interests in Vermont politics and policy.

### 2. Evidence Concerning the Effect Act 64 Will Have on Campaigns— Narrow Tailoring

#### a. Contribution Limits.

1. *Statistics.* Statistics show that Act 64's contribution limits would have very little effect on typical contribution patterns in Vermont. Approximately 88% to 96% of the campaign contributions to recent House races were under $200. Approximately 95% of the campaign contributions to the 1994 and 1996 Senate races would have been unaffected by the new limits since they did not exceed $300. Even in the more heavily funded 1998 race, more than 82% of contributions would have been unaffected. More than 90% of the campaign contributions to the statewide candidates would have been unaffected by the new limits. Not all statewide candidates received contributions over the $400 limit. *See generally,* Expert Report of Anthony Gierzynski, Defendants' Exhibit U. Gierzynski testified that the shortfall in fundraising reflected in these statistics could be made up for by finding additional sources.

2. *Effective campaigning.* A great deal of the testimony at trial focused on the question of whether candidates would be able to wage effective campaigns under the new contribution limits. Although Plaintiffs' and Defendants' witnesses at times offered completely different opinions on this point, the more credible evidence shows that such campaigns would indeed be possible.[19] In Vermont, many politi-

---

**19.** Witnesses almost unanimously agreed that the concept of an effective campaign encompasses more than just winning campaigns. Numerous witnesses testified that in a small, community-oriented, principally rural state such as Vermont it would be a mistake to

equate effectiveness with the highest spending candidate. Winning was one, but not the only, measure of success described by witnesses. William Meub testified that an effective campaign is a "competitive campaign." Ruth Dwyer's campaign manager Kathleen

cians have run effective and winning campaigns with very little money, and some with no money at all. Plaintiffs' allegations that it would take up to a million dollars to run an effective campaign in this state are wholly unreasonable. Several candidates, campaign managers, and past and present government officials testified that they will be able to raise enough money to mount effective campaigns in the system of contribution limits established by Act 64.[20]

3. *Example: The March 1999 Burlington Mayoral election.* Contribution limits of $200 were in effect for the March 1999 Burlington Mayoral race. The two principal candidates for mayor in 1999 were Peter Clavelle and Kurt Wright. Both were able to amass sufficient resources to run effective campaigns. Clavelle raised almost $39,000, more than he raised in three of his four previous campaigns for mayor. He raised more than $24,000 from 794 contributors of $100 or less. Only 55 contributors gave him the maximum contribution of $200. Wright raised $19,000. Although he received 44 contributions of $200, this was only 13% of all his contributors. He received 290 contributions, amounting to over half of his funds, from contributors of $100 or less. By his own statements, Wright ran an effective campaign in a competitive race against incumbent Clavelle.

4. *Curtailment of contributor expression.* In the context of Vermont politics, $200, $300, and $400 donations are clearly large, as the legislature determined. Small donations are considered to be strong acts of political support in this state. William Meub testified that a contribution of $1 is meaningful because it represents a commitment by the contributor that is likely to become a vote for the candidate. Gubernatorial candidate Ruth Dwyer values the small contributions of $5 so much that she personally sends thank you notes to those donors.

b. Expenditure Limits.

1. *Statistics.* The evidence demonstrated that spending limits would have very little effect on House, Senate, and statewide races. Vermont House districts are extremely small. There are about 4,000 people in a single-member district and 8,000 in a two-member district. Only New Hampshire has smaller House districts. Furthermore, the voting-age population of the districts is smaller than the total population, and the number of actual voters is smaller yet. The average number of votes received by winners in single-member districts in the House in 1998 was 1,022; the average number of votes received by winners in two-member House districts was 1,585. The average spending in those districts in the past three election cycles was almost uniformly below the levels chosen for Act 64. The only exception was the single-member district average in 1994, in which the average was $10 over Act 64's $2,000 limit. No serious argument can be made that $10 would make a difference in such a race.

Average spending in Vermont Senate races for the past three election cycles has also generally been below the spending

---

Summers testified that an effective campaign gets name recognition for the candidate and establishes a connection between the voter and the candidate's beliefs.

**20.** Mark Snelling testified that with a $400 contribution limit a candidate for Governor or Lieutenant Governor would be able to raise $300,000 to $400,000, and that candidates for those offices would not have their voices drowned out at those levels; Former Secretary of State Don Hooper testified that candidates for that office could raise sufficient funds for an effective campaign when contri-

butions are capped at $400; Former Lieutenant Governor and Congressman Smith said that a $300 contribution limit for State Senate candidates, and $400 contribution limit for Governor and Lieutenant Governor would still permit candidates to amass sufficient funds to run effective campaigns in Vermont; Ellen David Friedman, co-chair of the Progressive Party, believes that candidates for legislative and statewide offices can amass sufficient resources to run effective campaigns at the contribution levels set by Act 64.

limits established by Act 64. In the two-member, three-member and six-member Senate districts, candidates underspent the limits applicable to these districts by amounts ranging from $590 up to $7,120. Only in the single-member senate districts did average spending exceed the new limits.

2. *Effective Campaigning.* Fact witnesses confirmed that fully effective campaigns for the Vermont Senate can be run under the limits established by Act 64. Peter Brownell testified that he had run an effective campaign for the Senate as a challenger in Chittenden County while spending only $11,000 in 1996. He was re-elected in 1998 while spending only about $9,000. William Meub testified that he spent only $6,000 to $7,000 in his Rutland County Senate race in 1990 (the same district Mr. Howard ran in), and that that was enough to get his message out in that campaign. Under Act 64, nonincumbent candidates in three-seat districts like Rutland County will be able to spend $9,000.

Spending in Vermont statewide elections is very low as well. Vermont ranks 49th out of the 50 states in campaign spending. The majority of major party candidates for statewide office in the last three election cycles spent less than what the spending limits of Act 64 would allow.[21] Over the three election cycles, the average spending by candidates for the lower statewide races (below the level of lieutenant governor) was less than $30,000, with the exception of the losers in 1998.

The Court rejects Darcie Johnston's testimony that it is necessary to spend between $800,000 and $1 million to run an effective campaign for Governor of Vermont. No candidate for Governor of Vermont has ever spent that much money on a campaign. Nor does the Court accept that candidates must spend approximately $500,000 in order to run effective campaigns for Lieutenant Governor and the other lower statewide offices of Secretary of State, Treasurer, Auditor, and Attorney General. No one has ever spent this much for any of these offices, even though there have been competitive races for them.

In Vermont legislative races, low-cost methods such as door-to-door campaigning are standard and even expected by the voters.[22] Other effective low-cost methods of campaigning include participating in debates, using volunteers to distribute literature or staff booths at markets or fairs, attending suppers and barbecues, advertising with placards during rush hour, using public access television ads, and issuing press releases to generate free coverage in the media.

Most Vermont House and Senate candidates generally do not use campaign staff or advertise on television. When television is used—primarily in campaigns for statewide office—it is relatively inexpensive compared to other states.

### c. Out-of-state Funds.

1. *Statistics.* Although some candidates in prior elections have received more than 25% of their campaign contributions from out-of-state donors, most candidates' total income will be unaffected or only slightly affected by the limit on out-of-state contributions. In House races, the average percentage of revenues from out-of-state contributions to House candidates was 2.2% in 1998, 2.6% in 1996, and 1.7% in 1994. In 1994, 96% of the candidates for the House raised less than 25% of their revenues from outside of Vermont. In 1996, 97.9% of the candidates for the House raised less than 25% of their revenues from outside of Vermont. In runs for Senate, the average

---

21. Based on past campaigns, it is fairly clear that Act 64's spending limits would have little, if any, impact on statewide third-party campaigns. None of the third-party candidates for statewide office spent anywhere near the new spending limits in the last three election cycles.

22. Plaintiff Neil Randall, who defeated a long-term incumbent in 1998, said that door-to-door campaigning was "essential" to his success.

percentage of revenues from out-of-state contributions to Senate candidates was 9% in 1998, 9% in 1996, and 7.5% in 1994. In 1994, 93.7% of the candidates for the Senate raised less than 25% of their revenues from outside of Vermont. In 1996, 87.9% of the candidates for the Senate raised less than 25% of their revenues from outside of Vermont. In statewide races, most statewide candidates' out-of-state contributions did not exceed the 25% limit and all but one of the minor party candidates from 1994 to 1998 received no money from out-of-state contributors (one minor party candidate received $28 from a contributor in Nebraska).[23]

2. *No proof that 'out-of-state' money corrupts more than in-state.* There was no record before the general assembly and no evidence at trial to suggest that contributions from out-of-state sources are any more or less corrupting than those from in-state sources. Nor was there any record or evidence that out-of-state contributions have any greater appearance of impropriety than those from in-state sources.

Non–Vermont contributors may have legitimate interests in Vermont politics and policy. Some examples are second homeowners, those interested in environmental matters, and those interested in broader regional matters such as the Northeast Dairy Compact.

d. Limits on Contributions to and from Political Parties.

1. *Statistics.* Thus far, under the limits imposed on contributions to political parties by Act 64, it appears that political parties in Vermont are functioning largely as they have in the past. Vermont Republican Party Chair Pat Garahan acknowledged that as of the date of his testimony (May 2000), the party has already succeeded in raising approximately $400,000 for the year 2000 elections—all in amounts of $2,000 or less. For the entire 1998 election cycle, the party raised only about $283,000 in amounts of $2,000 or less, according to Bensen's report ($693,000 total contributions minus $410,000 raised in amounts over $2,000).

Garahan testified that he cannot be certain how much the party will raise altogether for the 2000 elections, but he expects to raise another $100,000 to $150,000. Thus, even Garahan's prediction is that the party may well raise $550,000 in the very first cycle that Act 64 is in effect—compared to $693,000 when donations to the party were subject to no limits whatsoever. Even if it is assumed that Garahan is not being overly cautious in his predictions, this is a substantial portion of the party's past revenues.

2. *Role of Parties in Our Political System.* There is a clear link between strong political parties and orderly campaigns. In Vermont, however, get-out-the-vote efforts, seed money, candidate recruitment and training, and compilation of voter lists are just a few of the vital services that political parties provide to the electoral competition. In terms of political expression, contributions to and from Vermont political parties mean something quite different from contributions to candidates from individual Vermonters. Contributing money to candidates is a major means by which political parties define their existence.

3. *Distinction Between Parties and PACs.* Political Action Committees (PACs), by contrast, function quite differently from political parties in our electoral system. Political parties may have policy platforms, but they are not targeted advocacy organizations. PACs, in contrast, are specifically designed to advocate special interests. Money coming from PACs is therefore much more likely to be designed to gain influence over legislative matters. As a

---

**23.** It should be noted that these statistics understate to a certain extent the money that comes in from out of state. Consistent with Section 2805(f), money coming from out of state family members to the third degree of consanguinity would not be counted toward the 25%. Vt.Stat.Ann. tit. 17, S.2805(f).

result of this phenomenon, large PAC contributions are more likely to generate suspicions of undue political influence in the minds of the electorate. This makes sense, since candidates who receive money from PACs almost always know where the money comes from and why it was given.

## II. DISCUSSION

### A. Preliminary matters: jurisdiction and standing.

#### 1. Jurisdiction

This Court has jurisdiction to hear claims arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1343(a), as well as jurisdiction over constitutional challenges pursuant to 28 U.S.C. §§ 1331 and 1343(a). Abstention is inappropriate for reasons consistent with those discussed in the Second Circuit's recent opinion *Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376 (2d.Cir.2000) ("*VRLC*").

A federal court may only abstain "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ("*Pullman*"). "There is little or no discretion to abstain in a case which does not meet traditional abstention requirements," *Bethphage Lutheran Serv., Inc. v. Weicker,* 965 F.2d 1239, 1244–45 (2d Cir.1992) (internal quotation marks omitted).

Under *Pullman,* abstention may be appropriate when (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible "to an interpretation by a state court that would avoid or modify the federal constitutional issue." *Greater New York Metro. Food Council v. McGuire,* 6 F.3d 75, 77 (2d Cir.1993) (per curiam). Satisfaction of all three criteria does not automatically require abstention, however. The power is thus discretionary.

In deciding how to exercise this discretion, federal courts are instructed to engage in " 'a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.' " *Young v. United States Dep't. of Justice,* 882 F.2d 633, 644 (2d Cir.1989) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

In the present action, at least two of the *Pullman* doctrine's three prerequisites to abstention are not satisfied, because the statutory provisions at issue are not unclear and any interpretation given them by the Vermont state courts would not avoid the constitutional questions raised.

Furthermore, in *Bad Frog Brewery, Inc. v. New York State Liquor Authority,* 134 F.3d 87, 93–94 (2d Cir.1998), the Second Circuit held that district courts must exercise particular caution before abstaining where a plaintiff has raised a facial constitutional challenge to a statute and the attendant delay would inhibit exercise of the First Amendment freedoms injured by the statute's existence. "In the context of First Amendment claims, *Pullman* abstention has generally been disfavored where state statutes have been subjected to facial challenges." *Id.* at 94; *see also City of Houston, Texas v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

Because the *Pullman* test is not satisfied, and because delay would clearly impede Plaintiffs' exercise of their First Amendment rights during the year 2000 Vermont state election campaigns, this Court will not abstain.

#### 2. Standing

Article III, § 2 of the United States Constitution restricts federal courts to deciding "Cases" and "Controversies." Federal courts must determine at the threshold of every case whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolu-

tion of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d ·636 (1972). "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The threat of suit under the questioned statute may be injury enough. Plaintiffs bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that they will be prosecuted under the statute to show injury, but only that they have "an actual and well-founded fear that the law will be enforced against" them. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)). "[T]he alleged danger of th[e] statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *American Booksellers,* 484 U.S. at 393, 108 S.Ct. 636. *See generally VRLC v. Sorrell,* 221 F.3d 376.

■ Under this standard, the record supports Plaintiffs' standing to challenge each of the provisions at issue here. Defendants have ·meticulously challenged each Plaintiff's standing, and have broken each provision of Act 64 into the smallest possible subdivided pieces. Defendants argue, for instance, that in order for Plaintiffs to challenge Section 2805(a), which sets limits for contributions to campaigns for state representative, state senator, governor, lieutenant governor, secretary of state, state treasurer, state auditor, and state attorney general, as well as for contributions to political parties and political committees, Plaintiffs must have within their ranks someone who is involved in each and every one of those elections and organizations. This extreme view of standing doctrine is excessively meticulous. It is, rather, sufficient that each Plaintiff legitimately possesses "an actual and well-founded fear that [Act 64] will be enforced against" them, *American Booksellers,* 484 U.S. at 393, 108 S.Ct. 636, and that at least one Plaintiff has legitimate standing to challenge each of the provisions at issue:

Plaintiffs Donald Brunelle, Neil Randall, George Kuusela, and John Patch, as candidates for either the Vermont House or Senate who plan to collect contributions and make expenditures in their runs for office, have standing to challenge Sections 2801(2) and (5), 2805(a), (c) and (f), 2805a(a), and 2809(a)–(d). Plaintiff Marcella Landell, a registered Vermont voter who receives campaign literature from political organizations and candidates she wishes to support, stands to have her First Amendment right of association curtailed by Act 64's spending limits and therefore has standing to challenge Section 2805a(a) and 2809(a)–(d). Plaintiff Jeffrey Nelson has in past election cycles made political contributions in excess of the limits established in Act 64 and therefore has standing to challenge Section 2805(b). Plaintiff Steve Howard, who formerly held elected office in Vermont and intends to run again in the future, testified that he refrained from running for office this year because he felt Act 64 would have seriously impeded his ability to raise sufficient funds for

his election campaign. He therefore has standing to challenge Sections 2801(2), 2805(a), (c) and (f), 2805a(a), and 2809(a)–(d). Plaintiff Vermont Right to Life Political Action Committee, as a registered, internal, state political action committee which intends to raise and contribute money to certain Vermont political candidates in the upcoming election, has standing to challenge Sections 2805(a) and (c), as well as 2809(a)–(d).

Plaintiffs Vermont Libertarian Party and Vermont Republican State Committee are registered political parties in Vermont. As such, they financially support selected candidates for office by raising and contributing money to those candidates. Because they intend to carry out their supporting role for Vermont political candidates this year and in the future, they have standing to challenge all sections pertaining to the definition of, and limits on, political parties, including Sections 2301 through 2320, 2801(5), 2805(a) and (c), and 2809(d).

Plaintiffs therefore have standing to bring this action.

## B. Constitutionality of the Challenged Provisions

In evaluating constitutionality of Act 64, this Court has adopted the selection of official findings excerpted above in the facts section of this opinion. Although legislative findings are not entirely isolated from review, *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 199, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), this Court is required to exercise considerable deference to such findings. *Id.* Having reviewed the evidence and testimony presented to the legislature in the hearings on Act 64, this Court adopts the excerpted findings.

■ The Court may also, however, consider evidence presented at trial that was not available to the legislature. Consideration of such additional evidence is both proper and common. *See Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377,

120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("*Shrink*") (evidence relied upon by the Supreme Court in upholding Missouri's limits came almost entirely from evidence presented by the parties during litigation because Missouri does not preserve legislative history); *see also Daggett v. Commission on Governmental Ethics and Election Practices,* 205 F.3d 445, 456 (1st Cir.2000) ("*Daggett II*") (relying on evidence presented during litigation to determine constitutionality of contribution limits).

### 1. Act 64's Contribution Limits, Vt. Stat.Ann. tit. 17, § 2805(a) and (b), As They Pertain to Individuals, Are Constitutional

■ Sections 2805(a) and (b) limit contributions to candidates for Vermont office in a two-year election cycle to $200 for state representative, $300 for state senator, and $400 for governor, lieutenant governor, secretary of state, state treasurer, state auditor, and state attorney general. The legislature enacted this provision because it found that large contributions reduce public confidence in the electoral process and increase the appearance that candidates and elected officials will not act in the best interest of Vermont citizens. Finding (a)(9). Plaintiffs insist that the statute constitutes an impermissible limit on their free speech and association rights, that it is not supported by a sufficient governmental interest, and that it is not narrowly tailored. As to the latter claim, Plaintiffs argued in pre-trial pleadings that the provision improperly lumps together fundraising for primary and general elections, that the provision will have a disparately negative impact on the ability of certain candidate subgroups to attain office, and that the family exception is overbroad.

■ The legal standard for evaluating the constitutionality of campaign contribution limits was established by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per cu-

riam). There, the United States Supreme Court considered constitutional challenges to certain provisions of the Federal Election Campaign Act ("FECA"). Among other things, FECA limited federal campaign contributions and expenditures. Such limitations, the Court warned,

> operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Buckley,* 424 U.S. at 14–15, 96 S.Ct. 612 (citing *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Any limits on such political expression are subject to "exacting scrutiny," *id.* at 16, 96 S.Ct. 612, and can survive constitutional attack only if justified by a compelling state interest. *Id.* at 44–45, 96 S.Ct. 612.

Having established that exacting scrutiny applied generally to the area of campaign finance regulation, however, the *Buckley* Court then distinguished between the different degrees of constitutional threat posed by contribution and expenditure limits. On the one hand, contribution limits could be found constitutional if they served the compelling state interest of deterring actual or perceived *quid pro quo* corruption. *Id.* at 25–26, 96 S.Ct. 612. On the other hand, the Court found that expenditure limits could not be similarly justified because money being spent by a candidate on him or herself could not give rise to any such *quid pro quo* arrangement. *Id.* at 55, 96 S.Ct. 612. *See also Kruse v. City of Cincinnati,* 142 F.3d 907, 915 (6th Cir.1998), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998) ("A fortiori, the spending of money legally raised by candidates themselves poses no risk of *quid pro quo* corruption ...") In

light of this distinction, the Court established a less stringent standard to be applied to contribution limits.

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.

*Buckley,* 424 U.S. at 20, 96 S.Ct. 612. Pursuant to this less stringent standard, the Court upheld FECA's $1,000 limit on contributions by individuals or groups to candidates for federal office. The Court agreed that Congress had reason to believe that contributions over $1000 gave rise to perceptions of corruption, and that this belief was a sufficient to justify such limits. *Id.* at 26–27, 96 S.Ct. 612.

While accepting the anti-corruption rationale, however, the Court specifically rejected two other proposed government interests; namely, the spiraling cost of political campaigns, and the government's desire to level the playing field between candidates with disparate access to campaign funds. *Id.* at 25–26, 96 S.Ct. 612.

*Buckley* did not establish absolute dollar thresholds. "[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." *Buckley,* 424 U.S. at 30, 96 S.Ct. 612 (quotation omitted); *see also Daggett v. Webster,* 81 F.Supp.2d 128, 139 (D.Maine 2000) (*"Daggett I"*) ("If contribution limits are permissible, differences in their level from state to state should reflect democratic choices, not court decisions.")

The *Buckley* Court also never explicitly stated that anti-corruption was the only acceptable compelling government interest; it only stated that spiraling costs and leveling the playing field were not acceptable. 424 U.S. at 25–26, 96 S.Ct. 612. *Buckley* therefore has not foreclosed recognition of additional compelling governmental interests.

In *Shrink,* 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), the Court revisited the issue of contribution limits for the first time since *Buckley.* In upholding a Missouri statute that imposed a $1000 limit on individual contributions, the Supreme Court affirmed its fundamental holdings in *Buckley:* infringements upon campaign finance invoke the First Amendment and are therefore subject to "exacting" scrutiny, and the only recognized justification for them is actual or perceived corruption. 120 S.Ct. at 906–907. The *Shrink* Court further clarified that a contribution limit involving "significant interference" with associational rights can only survive if the Government demonstrates that the contribution regulation "[i]s closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tun[ed]." *Id.* 120 S.Ct. at 904 (citations omitted). The Court repeated that its authorization of $1000 limit in *Buckley* wasn't based on a specific dollar amount. "[T]he dictates of the First Amendment are not mere functions of the Consumer Price Index." *Id.* at 909 (quoting *Shrink Missouri Government PAC v. Adams,* 161 F.3d 519, 525 (8th Cir.1998) (dissenting opinion)). Rather, the figure was adjustable and was to be controlled by the principle that contribution limits could not be set so low as to create ineffective campaigns. *Id.*

Proof of actual or perceived corruption does not need to be exacting. "Buckley was practical on the subject of proof; it recognized that corruption could 'never be reliably ascertained.'" *Daggett I* 81 F.Supp.2d at 134 (2000) (quoting *Buckley,* 424 U.S. at 27, 96 S.Ct. 612.) All that is required is that the threat not be illusory. *Id.*

The threat of corruption in Vermont is far from illusory. Evidence provided by citizen polls and comments by public officials demonstrate that the threat is quite real. Furthermore, it is beyond argument that the public perceives corruption in the political electoral system. Typical barom-

eters of citizen concern such as polls and media coverage point to the fact that Vermonters are troubled by how money influences campaigns. Such barometers have been used by many other courts in evaluating the governmental interest that underpins contribution limits. *See Daggett v. Comm'n on Governmental Ethics and Election Practices,* 205 F.3d 445 at 457 (2000) (*"Daggett II"*); *Shrink Missouri Government PAC v. Adams,* 204 F.3d 838, 841–842 (8th Cir.2000). *See also Florida Right to Life v. Mortham,* slip op, at 10, No. 98–770–Civ–Orl–19A (M.D.Fla. March 20, 2000). The Court therefore concludes that Defendants have demonstrated that the state had a sufficient governmental interest to support its adoption of contribution limits.

Having established that a compelling governmental interest justified Act 64's contribution limits, this Court must now consider whether those limits are narrowly tailored to serve that interest. In determining whether contribution limits are narrowly tailored, courts have considered factors such as cost-per-voter statistics, the level of limits that have survived constitutional challenge elsewhere, the experiences of persons running for office, costs of campaigning, types of campaigning, history of reform, and media reflection of general public sentiment. *See, e.g., Daggett II,* 205 F.3d at 457; *Shrink Missouri Government PAC v. Adams,* 204 F.3d 838, 841–842 (8th Cir.2000); *Florida Right to Life v. Mortham,* slip op. at 10, 98–770–Civ–Orl–19A. The Vermont legislature considered each of these factors as well.

Statistics proffered at trial show that the vast majority of contributors in the past three election cycles have made contributions at or below the maximum levels set by Act 64. Expert testimony revealed that over the last three election cycles the percentage of all candidates' contributions received over the contribution limits was less than 10%. (In two of the three previous election years, only 5% to 6% of contributors to Senate campaigns would have

been affected, and only 4% to 5% of contributors to House campaigns would have been affected.)

Furthermore, Vermont's limits are squarely within the bounds of constitutionality when compared to contribution limits upheld in Maine and Missouri. In *Daggett II*, the First Circuit examined a Maine law that limited contributions to $250 for House and Senate candidates. The Court initially compared the limit with the $1,075 limit per 250,000 constituent limit upheld in *Shrink*. Given that Maine House Districts averaged 8,000 constituents and Senate Districts averaged 34,000, the Court found the $250 limit permissible in light of the *Shrink* limit. *Daggett II*, 205 F.3d at 459. It then examined the historical spending and contribution patterns of Maine elections. In light of the non-expensive nature of the typical Maine campaign and the limited impact of the limits on the historical levels of giving, the Court found the limits constitutional. *Id.* at 458–462. Proportionally speaking, Vermont's limits are perhaps even more generous than those of Maine, for while they are roughly comparable in dollar amount, the relevant districts in Vermont contain substantially fewer voters. Following remand from the Supreme Court, in *Shrink Missouri Government PAC v. Adams*, 204 F.3d 838 (8th Cir.2000), the Eighth Circuit upheld Missouri's per election contribution limits of $525 for State Senate or any office where the population of the electoral district is 100,000 or more and $275 for House or any office where the population of the electoral district is under 100,000. *Id.* at 842–43. Vermont's ratio of the contribution limit to the size of the constituency is .00068 for statewide elections, whereas the same ratio for Missouri is .00040. Vermont's statute allows over 50% more

money to be contributed per constituent than does Missouri.[24]

The possibility of effective campaigning is an integral component of the narrow tailoring standard. *Shrink*, 120 S.Ct. at 900. In the present case, the Court heard ample evidence on this point, the most significant of which concerned the 1999 Burlington Mayoral election. Burlington, located in Chittenden County, is the largest city in Vermont. In terms of voting population and the cost of running an effective campaign, the Burlington Mayoral election provides a reasonable comparison to a countywide senate race. The revenues raised in that race suggest that the $300 contribution limit for State Senate races will not adversely affect senatorial candidates. The candidates for mayor of Burlington were limited to $200 contributions, yet they raised $19,000 to $39,000. The candidates for State Senate from Chittenden County will be limited to $300 contributions. In the past Chittenden County Senate candidates have spent on average $10,000, with ranges up to $30,000. Given the higher contribution limit for the Senate races, they should be able to raise at least as much as was raised in Burlington.

Witnesses did acknowledge that they may need to employ new fundraising techniques to raise this money. They may need to broaden their base of support as they seek more small contributors, rather than rely on a few large contributors. This will take more time and energy. Yet credible testimony from citizens, politicians and experts suggested that compelling candidates to increase constituent contact would improve the health of the democratic system.

The limits set by the legislature do accurately reflect the level of contribution considered suspiciously large by the Vermont

---

24. *See also Florida Right to Life v. Mortham*, slip op., No. 98–770–Civ–Orl–19A, where the District Court upheld Florida's $500 limit on contributions to candidates. While House Districts in Florida contain 90,000 residents, the largest House Districts in Vermont are barely one-tenth the size, with 4,000 constitu-ents in a one-member district, and 8,000 in a two-member district. While Senate campaigns in Florida typically cost $250,000, the average Senate campaign in Vermont over the past three election cycles has been in the $7,000 to $12,000 range.

public. Testimony suggested that amounts greater than the contribution limits are considered large by the Vermont public. (Young, Rivers, Pollina, Smith.) Plaintiffs testified to this as well. (Patch, Kuusela, Landell.)

Contrary to Plaintiffs' claims, Act 64's contribution limits may in point of fact actually improve candidate-voter communication by lessening the need for candidates to concentrate on wooing big donors. By diminishing the need for targeted pandering, these limits arguably enhance, rather than limit, a candidate's freedom to communicate. Statistics do reveal that some candidates may be hit harder by these limits than others. However, the overall effect on fund raising will be rather small.

Finally, the Court wishes to respond briefly to three other matters pertaining to narrow tailoring. Although these matters do not affect the Courts finding that the statute is narrowly tailored, they nevertheless came up frequently in court and each merits brief comment.

First, the legislature rejected the idea of having two different regulatory regimes for primary and general elections in favor of applying one overall limit. This was so that candidates would have greater freedom to decide how to allocate their funds between the primary and general elections. In itself, the legislature's reasoning is not evidence of insufficient tailoring. Vermont's primary is closer to the general election than is true in most states. This year's primary election, for example, will be in mid-September, just two months before the general election. In Maine, the primary is in June. Me.Rev.Stat.Ann. 21–A § 339 (West 19__); In Missouri, the primary is in August. Mo.Rev.Stat. § 115–121 (19__). Application of the limits to the two-year election cycle is entirely reasonable given this proximity.

Second, with regard to particularly affected groups, the Court's role "is not to probe the intricacies of the limit. Even if we were to consider the effects on individual groups, we would not find enough to deem the limits facially unconstitutional." *Daggett II*, 205 F.3d at 461 (citations omitted). Plaintiffs did not prove that specific types of candidates, be they challengers or incumbents, republicans or democrats, non-wealthy, women, non-traditional, or third-party candidates, would be disproportionately affected by the contribution limits. Across the board, Plaintiffs' arguments on this point were speculative.

Finally, a few words of clarification on the exception made to these limits for family members within three degrees of consanguinity are necessary. Section 2805(f) defines "immediate family" as "individuals related to the candidate in the first, second or third degree of consanguinity." Consanguinity is defined as "the relationship of persons of the same blood or origin." Black's Law Dictionary 299 (7th ed.1999); *see also MacCallum v. Seymour's Administrator*, 165 Vt. 452, 686 A.2d 935, 937 (1996) (noting that consanguinity means "bloodline").[25]

Act 64 does not provide what system should be used for determining relationships and degrees of kindred. In other contexts, however, Vermont relies on the civil law rules in making this determination. *See, e.g.,* Vt.Stat.Ann. tit. 14, § 552 (under Vermont's descent laws, the degrees of kindred are computed according to the rules of the civil law); *State v. Wyman*, 59 Vt. 527, 8 A. 900, 901 (1887) (noting that ". . . a Vermont criminal statute in effect in 1887 provided that 'degrees of kindred shall computed according to the rules of the civil law' "). In order to determine degrees of kindred under the civil law rules, one "begins with the intestate,

---

**25.** Consanguinity is distinguished from affinity, which is the "relation that one spouse has to the blood relatives of the other spouse." Black's Law Dictionary 59 (7th ed.1999). Contributions from the candidate's spouse and the spouse's blood relatives are limited by Act 64's contribution limitations because these contributions are from individuals related to the candidate by affinity and not by consanguinity.

and ascend[s] from him to common ancestor, and descend[s] from that ancestor to claimant, reckoning a degree each generation." 26a C.J.S. *Descent & Distribution,* Section 22.

Applying the civil law rules to Act 64, contributions from the candidate's great-grandparents, grandparents, parents, children, grandchildren, great-grandchildren, aunts, uncles, siblings, nieces, and nephews are not limited by Act 64's contribution limitations. Contributions from the candidate's great aunts and uncles and first cousins, however, are capped by Act 64's contribution limitations.

The Court does not accept Plaintiffs' contention that the validity of Act 64's contribution limits is undermined by this exception. Act 64's contribution limits are designed to target corruption. The Vermont legislature properly reasoned that a contribution from one's grandmother is not as likely to have a corrupting effect as a contribution from a tobacco company or labor union.

For all of the reasons set forth above, Act 64's contribution limits are constitutional.

### 2. *Act 64's Expenditure Limits, Vt.Stat.Ann. tit. 17, § 2805a(a), Are Unconstitutional*

▮ Section 2805a(a) limits candidate expenditures in any given two-year election cycle to $300,000 for governor; $100,000 for lieutenant governor; $45,000 for secretary of state, attorney general, treasurer, and auditor; $4,000 for state senator plus $2,500 for each additional seat in the relevant jurisdiction and $2,000 for state representative in a single-member district, and $3,000 for state representative in two-member districts. Vt.Stat.Ann. tit. 17, § 2805a(a). In support of Act 64's expenditure limits, the Vermont legislature found, *inter alia,* that election campaigns for statewide and state legislative offices were becoming too expensive, and that as a result "many Vermonters are financially unable to seek election to public office and

candidates for statewide offices are spending inordinate amounts of time raising money." Finding (a)(1). The legislature also found that "[r]obust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have increased." Finding (a)(4). Plaintiffs insist that this is a flatly unconstitutional ban on a candidates' free speech rights.

*Buckley* set an extremely high constitutional threshold for expenditure limits when it held that FECA's "expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions." *Buckley,* 424 U.S. at 24, 96 S.Ct. 612. The Court explicitly distinguished the indirect restraint on political discourse posed by contribution limits from the direct restraint posed by expenditure limits. Because "[T]he independent advocacy restricted by [FECA's spending limit] does not ... appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions, *id.* at 46, 96 S.Ct. 612, the Court concluded that FECA's spending limits could not be justified by deterrence of *quid pro quo* corruption. *Quid pro quo* arrangements, the Court explained, simply could not arise out of candidates spending money on dissemination of their own messages." *Id.*

Since *Buckley,* only one circuit court has considered the constitutionality of spending limits. In *Kruse v. City of Cincinnati,* 142 F.3d 907 (6th Cir.), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998), the Sixth Circuit struck down spending limits enacted by the City of Cincinnati for its city council elections. The court adhered narrowly to *Buckley,* reasoning that because *Buckley* held that spending limits are not justified by deterrence of *quid pro quo* corruption, nor by stemming the high cost of campaigns, nor by striving for a level playing field with

respect to campaign funds, and because the city of Cincinnati offered only those interests, the spending limits were impermissible. 142 F.3d at 909:

There is, however—both in *Kruse* and among the Justices of the Supreme Court—substantial disagreement over whether *Buckley* leaves open the possibility that other governmental interests might support spending limits. In *Kruse,* one member of the panel, while concurring in the ruling striking down Cincinnati's limits, disagreed with the majority's interpretation of *Buckley,* concluding that *Buckley* does not render spending limits unconstitutional as a matter of law:

> The Supreme Court's decision in *Buckley* ... is not a broad pronouncement declaring all campaign expenditure limits unconstitutional. It may be ... that the interest in freeing officeholders from the pressures of fundraising so they can perform their duties, or the interest in preserving faith in our democracy, is compelling, and that campaign expenditure limits are a narrowly tailored means of serving such an interest.

*Id.* at 920 (concurring opinion of Cohn, D.J., sitting by designation).

In *Shrink,* four Justices opined that neither *Buckley* nor the First Amendment should be read as an inflexible bar to spending limits. Justice Breyer called for a constitutional analysis of campaign finance limits that balances competing constitutional interests. *Shrink,* 120 S.Ct. at 913 (concurring opinion of Breyer, J., joined by Ginsburg, J.). He stated that "it might prove possible to reinterpret aspects of *Buckley* in light of the post-*Buckley* experience ... making less absolute the contribution/expenditure line, particularly in respect to independently wealthy candidates, whose expenditures might be considered contributions to their own campaigns." *Id.*

Justice Kennedy stated, "[f]or now, however, I would leave open the possibility that Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions, thus permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising." *Id.* at 916 (Kennedy, J., dissenting).

Justice Stevens' explained that he believes that money is property, not speech, *id.* at 910, and as such, it is entitled to the constitutional protections normally afforded to property rather than speech. "These property rights, however, are not entitled to the same protection as the right to say what one pleases." *Id.* (Stevens, J., concurring).

Justices Stevens and Ginsburg voiced similar concerns with *Buckley* in *Colorado Republican Federal Campaign Committee,* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ("*Colorado Republican* "):

> I believe the Government has an important interest in leveling the electoral playing field by constraining the cost of federal campaigns. As Justice White pointed out in his opinion in Buckley, "money is not always equivalent to or used for speech, even in the context of political campaigns." [Justice White dissented in Buckley on the campaign spending limits question.] It is quite wrong to assume that the net effect of limits on contributions and expenditures—which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fund-raising, and to diminish the importance of repetitive 30–second commercials—will be adverse to the interest in informed debate protected by the First Amendment.

*Id.* at 649–50, 116 S.Ct. 2309 (Stevens, J., joined by Ginsburg, J., dissenting) (citations omitted).

Powerful, if not controlling, judicial commentary such as this reinforces the view that the constitutionality of expenditure limits bears review and reconsideration. Spending limits are an effective response

to certain compelling governmental interests not addressed in *Buckley:* (1) "Freeing office holders so they can perform their duties," in the words of Judge Cohn, *Kruse*, 142 F.3d at 920, or, as Justice Kennedy put it, "permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising," *Shrink*, 120 S.Ct. at 916; (2) "[P]reserving faith in our democracy," *Kruse*, 142 F.3d at 920; (3) "[P]rotecting access to the political arena" as stated by Stevens, *Colorado Republican*, 518 U.S. at 649–650, 116 S.Ct. 2309; and (4) "diminish[ing] the importance of repetitive 30–second commercials." *Id.*

This Court would be remiss not to acknowledge that the state proved that each of these concerns exist, and that Vermont's expenditure limits address them. The state's factual presentation at trial decidedly sets this case apart from both *Buckley* and *Kruse*. Judge Cohn remarked in *Kruse*, "[i]t should be recognized that [*Buckley* ] was decided on a slender factual record. Similarly, although the City here attempted to develop a compelling factual record, it failed to do so." 142 F.3d at 919.

The same simply cannot be said of this case. Given the wealth of evidence gathered by the Vermont legislature in the process of evaluating Act 64, this Court understands why it included spending limits as part of its comprehensive campaign finance bill.

Nevertheless, this Court is bound by the doctrine of *stare decisis* to adhere to Supreme Court precedent. In view of the absence of case law on this matter in this circuit, and the Supreme Court's directives in *Buckley*, this Court cannot take the unprecedented step of finding expenditure limits constitutional. *Kruse* is the only case on this matter other than *Buckley* itself. Its interpretation of *Buckley* must therefore be given proper consideration as well.

It is not insignificant that as soon as *Buckley* came out the Vermont legislature amended its campaign finance regulations by eliminating mandatory spending limits. *See supra*, at 464. At the very least this should be considered some indication of what the Vermont legislature thought of the dubious constitutionality of such limits at that time. Furthermore, spending limits do not exist anywhere in the country other than in the city of Albuquerque, New Mexico, and no one has challenged those limits yet.

Accordingly, Act 64's spending limits are unconstitutional.

### 3. Act 64's 25% Limit On Out–Of–State Funds, Vt.Stat.Ann. tit. 17, § 2805(c), Is Unconstitutional

 Section 2805(c) limits out-of-state contributions to 25% of a candidates' total contributions. Vt.Stat.Ann. tit. 17, § 2805(c). In support of these limits, the Vermont legislature found that "large contributions ... particularly from out-of-state political committees or corporations, reduce public confidence in the electoral process and increase the appearance that candidates and elected officials will not act in the best interests of Vermont citizens." Finding (a)(9). Plaintiffs argue that this impermissibly infringes on protected speech.

The only two reported decisions on the subject of out-of-state contributions were decided by the Ninth Circuit Court of Appeals. *VanNatta v. Keisling*, 151 F.3d 1215 (9th Cir.1998); *Whitmore v. Federal Election Comm'n*, 68 F.3d 1212 (9th Cir. 1995). Both decisions held that such contributions could not be restricted. In *VanNatta* the Ninth Circuit affirmed an injunction against a statute similar to the one challenged in this case. That statute limited to 10% the amount of money that could be contributed by out-of-district donors. 151 F.3d at 1218. Applying the rigorous scrutiny standard established by the Supreme Court for infringements on First Amendment rights, the panel unanimously agreed that the measure could not be supported by the state's interest in preventing corruption since out-of-state

contributors are no more linked to corruption than in-state contributors. *Id.* The Court also rejected a second interest purportedly advanced by the measure, protecting the integrity of a republican form of government by assuring that representatives are elected by their own constituents. *Id.*

Defendants contend that limits on out-of-state contributions combat the perception that the Vermont legislature might be unduly influenced by out-of-staters. Defendants argument on this point is not well focused. Firstly, most if not all of the examples of allegedly suspicious out of state contributions enumerated by Defendants—and especially those targeted by the press—also happened to be large and often from special interest groups that are viewed by the public stereotypically as the source of suspicious campaign money. There was no evidence that the fact that the money came from out of state is necessarily the root of the problem. Secondly, the proffered justification does not account for the fact that many people outside of Vermont have legitimate stakes in Vermont politics, and therefore have a right to participate in Vermont elections. Individuals from outside Vermont who are nevertheless influenced by Vermont law must have some access to the political process here.

In addition to the fact that the out-of-state contribution limit lacks the support of a legitimate governmental concern, the provision is also unconstitutional because it is not narrowly tailored. The mechanics of the provision are flawed in that it functions as a complete ban on the ability of some Vermont state level candidates to receive contributions from certain out-of-state would-be contributors.

Because no recognizable state interest exists to justify the out-of-state limits, and because the provision is not narrowly tailored, it violates the First Amendment freedoms of speech and association.

**4. Act 64's Limit on Contributions to Political Parties, Vt.Stat.Ann. tit. 17, §§ 2805(a) and (b), is Constitutional, But The Limit on Contributions from Political Parties to Candidates Is Not.**

**a. Act 64's Limits on Contributions to Political Parties Are Constitutional**

Section 2805(a) limits contributions to political parties to $2000. The legislature enacted this provision in order to prevent evasion of the individual contribution limits. Two separate questions of law govern the constitutionality of this provision: is it constitutional to regulate such contributions at all, and if so, to what extent?

*Buckley* upheld FECA's $25,000 aggregate annual limit on contributions by an individual, computed by combining an individual's contributions to all federal candidates, national political parties, and political committees in a given year. 424 U.S. at 25–26, 96 S.Ct. 612. The Court explained that the aggregate limit on contributions to all those entities was justified because it "serves to prevent evasion of the $1,000 contribution limitation [on donations to candidates] by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of ... huge contributions to the candidate's political party." *Id.* Given that *Buckley*'s aggregate contribution limits encompassed contributions to political parties, Act 64's specific limits on contributions to political parties deserve no different treatment—both are specifically and legitimately designed to prevent circumvention of individual contribution limits.

Three of the four opinions in *Colorado Republican Federal Campaign Committee v. FEC,* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996), indicate that a majority of Justices continue to endorse limits on contributions to political parties. The plurality opinion, while invalidating limits on

*independent* expenditures by political parties, indicated that direct donations to political parties could be limited:

> The greatest danger of corruption ... appears to be from the ability of donors to give sums up to $20,000 to a party which may be used for independent party expenditures for the benefit of a particular candidate. We could understand how Congress, were it to conclude that the potential for evasion of the individual contribution limits was a serious matter, might decide to change the statute's limitations on contributions to political parties.

*Id.* at 617, 116 S.Ct. 2309 (plurality opinion of Breyer, O'Connor and Souter).

The two dissenting Justices in *Colorado Republican,* Justices Stevens and Ginsburg, would have sustained the limits on independent expenditures by parties that were directly at issue in the case and, therefore, would sustain limits on direct contributions to and by parties. *Id.* at 649, 116 S.Ct. 2309. Justice Kennedy's opinion, joined by Chief Justice Rehnquist and Justice Scalia, carefully distinguished between limits on coordinated expenditures, viewed as protected expression by the party itself, and "undifferentiated political party contributions." *Id.* at 628–629, 116 S.Ct. 2309. Justice Kennedy stated that Congress may have the authority to regulate the latter, but noted that such a regulation was not at issue in the case. *Id.* at 630, 116 S.Ct. 2309.

Lower courts have upheld state limits on contributions to political parties as well. In *Citizens for Responsible Government State PAC v. Buckley,* 60 F.Supp.2d 1066, 1094–1096 (D.Colo.1999), the court upheld an annual limit of $2,500 on individual contributions to political parties in Colorado. "In order to prevent circumvention of individual contribution limits, Congress can

directly limit contributions to political parties ..." *Id.* at 1095. *See also State v. Alaska Civil Liberties Union,* 978 P.2d 597, 625 (Alaska 1999) (*"AkCLU"*) (upholding limit of $5,000 on contributions to political parties in Alaska).

Anti-evasion is thus a well recognized and accepted justification for establishing limits on giving to parties within campaign finance regulatory schemes. *Citizens for Responsible Government State PAC v. Buckley,* 60 F.Supp.2d at 1095. As the legislative findings state, Act 64's limit on giving to political parties was designed specifically to prevent evasion of the $200, $300, and $400 limits on contributions to candidates from individuals. Absent the provision, this loophole would permit large sums of money from a particular interest to reach candidates by passing through a political party. Although Vt.Stat.Ann. tit. 17, § 2805(e) prohibits the purposeful transfer of funds to a person for the purpose of further transferring it to a candidate, that provision is likely to catch only the most blatant behavior.[26]

The Court turns now to the question of narrow tailoring. Act 64's $2,000 limit on contributions to parties passes the narrow tailoring test so long as its dollar amounts are not "so radical in effect as to render political association ineffective, drive the sound of [a political party's] voice below the level of notice, and render contributions pointless." *Shrink,* 120 S.Ct. at 909.

The limits established by Act 64 hardly drive the voice of contributors to political parties so low as not to be heard. Donors may give $2,000 to a Vermont political party even if they have already made direct contributions to any number of individual candidates of the same party for Vermont office. Evidence clearly established that $2,000 contribution is a very large contribution in the context of Ver-

---

**26.** It was hardly speculative on the part of the legislature to think that such end runs would have been attempted. Indeed, Plaintiff Jeffrey Nelson testified that because of the limit on contributions to candidates he has already shifted his donations to the Republican Party and the Republican Legislative Election Committee PAC. It is reasonable to assume that larger special interest donors would do the same.

mont politics. In comparison to the contribution limits set for individual candidates, and in light of the testimony about what constitutes a large contribution in the eyes of the Vermont public, these limits in fact allow for very loud voices. Within the legislature's scheme for regulating campaign money, Act 64 actually promotes party activity above that of individual donors by allowing much higher donations to parties than to candidates.

Evidence of recent fundraising also suggests that the limits are at an appropriate level. Under the limits established by Act 64, the Republican Party had already raised $400,000 for the 2000 elections at the time of trial and expected to raise another $100,000 – $150,000, for a total of $500,000 – $550,000. By comparison, in 1998 when the Party raised more than in any other past election cycle, it raised a total of $693,000. Based on the Vermont Republican State Committee's experience so far, it appears its revenue will not decline as much as party revenues did in Alaska when similar limits were imposed. In *AkCLU*, 978 P.2d at 623, the limits on contributions to parties were upheld despite evidence showing that state Republican party revenues had declined from $362,525 in 1995 to $119,917 in 1997.

Given that Act 64's limit on contributions to parties serves the legitimate governmental interest of preventing evasion of individual constitutional limits, and given that the limit level will not unduly hush the voice of political parties in Vermont, the limit is constitutional.

**b. Although Limits on Contributions from Parties to Candidates Are Constitutional Generally, Act 64's Limits Are Unconstitutionally Low.**

██ · Because political parties play a unique role in the mechanics of our democracy, limits on contributions by them to candidates deserve especially careful attention. As the Tenth Circuit put it earlier this year:

Political parties have played a vital role in the American system of government.

[A]stute observers[ ] all agree that the political party is—or should be—central to the American political system. Parties are—or should be—integral parts of all political life, from structuring the reasoning and choice of the electorate, through all facets of campaigns and seemingly all facets of the government, to the very possibility of effective governance in a democracy.

John H. Aldrich, Why Parties: The Origin and Transformation of Political Parties in America 18 (1995).... In its FECA enactments, Congress certainly recognized the importance of parties.... The Supreme Court likewise has acknowledged the role of the party. Indeed, all three branches of government, to an important extent, rely on the speech and associational functions of parties to assure the orderly conduct of elections, appointments and governance in general.

*Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 213 F.3d 1221, 1228 (10th Cir.2000) (citations and quotations omitted). Proper consideration of this role, however, must be balanced against the threat of corruption that often filters through the party machines: "There is genuine potential for corrupting undue influence on a candidate's campaign if political parties are not restricted in their ability to contribute to individual candidates." *Citizens for Responsible Government*, 60 F.Supp.2d at 1094; "Absent any limits on contributions by parties, we believe there would be substantial potential for undue influence, i.e., *quid pro quo* corruption or the appearance of corruption. The natural tendency of successful candidates who receive unlimited contributions from a party would be to reduce independent consideration of issues and adhere to positions taken by the party itself." *AkCLU*, 978 P.2d at 626.

In an opinion rendered earlier this year, *Missouri Republican Party v. Lamb*, 100 F.Supp.2d 990 (E.D.Mo.2000), the District

Court for the Eastern District of Missouri confirmed that such limits are constitutional under *Shrink*. There, Judge Perry reflected on the importance of ancillary contribution limits to deter evasion of individual limits.

> Although [*Shrink*] does not directly answer the question of whether contribution limits on political parties are evaluated under the same standards applied to contribution limits on individuals, it answers the question indirectly by making clear that their constitutionality hinges on the type of financial support being given to the candidate, not the identity of the contributor: "[R]estrictions on contributions require less compelling justification than restrictions on independent spending." [*Shrink*], 120 S.Ct. at 904 [cites omitted].... Because [*Shrink*] expressly approved Missouri's claimed interests in limiting individual contributions, it follows that the state's corresponding limits on political parties must also be upheld as long as the same rationale applies and they meet the criteria set out in [*Shrink*].

*Lamb*, 100 F.Supp.2d at 996 (citations omitted) Elsewhere, Justice Kennedy recognized this as well.

> Congress may have the authority, consistent with the First Amendment, to restrict undifferentiated political party contributions which satisfy the constitutional criteria we discussed in Buckley.

*Colorado Republican*, 518 U.S. at 630, 116 S.Ct. 2309.

*Colorado Republican* does not bar limits on the amounts political parties may contribute to candidates. That decision struck down federal limits on independent expenditures by political parties, not limits on contributions directly to candidates. *See AkCLU*, 978 P.2d at 626 (noting that Supreme Court's *Colorado Republican* decision addressed independent expenditures, not contributions, and therefore does not apply in analyzing constitutionality of limits on contributions).

Limits on contributions from parties to candidates—like contributions from individuals to parties—cannot be so radical in effect as to render political association between parties and candidates ineffective. *Shrink*, 120 S.Ct. at 909. *See also Lamb*, 100 F.Supp.2d at 995. In *Lamb*, the limits at issue were comparatively high—roughly $10,000, $5,000, and $2,000 for statewide, house and senate races. *Id.* at 991. In upholding them, the Court observed first that in the period since the Missouri limits became effective, candidates had been quite capable of amassing sufficient funds to run effective races. Second, the court noted that the limits were ten times higher than those found constitutional in *Shrink*. *Id.* at 1000. Given those facts, the court did not see how the limits "could destroy Missouri's burgeoning campaign climate." *Id.*

Act 64's limits on parties—$400, $300, and $200—are far more stringent than those upheld in *Lamb*. More stringent, even, than the small scale of Vermont politics would justify. Political parties speak with a different voice than individuals. Such limits would reduce the voice of political parties to an undesirable, and constitutionally impermissible, whisper. For the stability and consistency of our competitive electoral process, parties must continue to function as they have in the past.

Although limits on the ability of a party to contribute money to candidates are vital to deter avoidance of the individual contribution limits, the current limits are too low to pass constitutional muster.

### c. Challenge to Sections 2801(5) and 2301–2320.

■■■ Act 64 defines political party as "a political party organized under Chapter 45 of this title or any committee established, financed, maintained or controlled by the party, including any subsidiary, branch or local unit thereof and including national or regional affiliates of the party." Vt.Stat. Ann. tit. 17, Section 2801(5). Under this definition, all town, county and state committees of a political party are treated as a

single entity which is subject to a single contribution limit. This construction of the statute has been confirmed by the Vermont Secretary of State.

Plaintiff Vermont Republican State Committee asserts that the Republican Party of Vermont is not one monolithic party, but a loose federation of independent, autonomous smaller parties. Each of these smaller organizations, Plaintiff contends, should enjoy its own independent rights of speech and association, and therefore should be able to contribute money to candidates up to the permissible limit. Plaintiff therefore argues that Section 2801(5), as interpreted by the Secretary of State, is an impermissible restriction on the internal organization and composition of the Vermont Republican Party.

By making this argument, however, the Vermont Republican Party proves to be inconsistent with the way it represents itself to the Court. While the State Committee claims that each of these committees is independent from one another and that the State Committee does not control the committees of the counties and towns, it stated in its Amended Complaint that it was bringing this lawsuit "on its own behalf and on behalf of ... its members, including its candidates, and all Republican town and county committees." Plaintiff VRSC Amended Complaint, at 1. Numerous witnesses confirmed that, despite the complaint's averment that it was brought on behalf of all county and town committees and all Republican candidates, none of those entities or individuals was asked to vote on or approve the lawsuit by the State Committee.

Furthermore, Vermont is by no means the first government authority to treat state, county and town committees as one for purposes of campaign finance. The federal government treats them as one in its provisions for limits on contributions to federal candidates. *See generally,* 2 U.S.C. Chapter 14 (Federal Election Campaigns).

Plaintiffs' challenge to 2801(5) and Chapter 45 is without merit.

### 5. Act 64's Limits on Contributions to and from Political Committees and Organizations, Vt.Stat.Ann. tit. 17, §§ 2805(a)–(b), are Constitutional.

Sections 2805(a) and (b) limit contributions from individuals to political action committees (PACs) to $2000, and limit contributions from PACs to candidates to the same levels applied to individuals—$200, $300, and $400 depending on the office.

#### a. Limits on contributions to PACs are constitutional.

■■■■ Under *Buckley,* a limit on contributions to PACs is "no more than a corollary of the basic individual contribution limitation." *Buckley,* 424 U.S. at 38, 96 S.Ct. 612 (upholding an aggregate limit of $25,000 on individual contributions to candidates, PACs, and political parties combined based on the potential that would otherwise exist for evasion of the individual contribution limits).

The Supreme Court affirmed this position in *California Medical Association v. Federal Election Commission,* 453 U.S. 182, 199, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (plurality opinion) (*"Cal–Med "*); *id.* at 203–04, 101 S.Ct. 2712 (Blackmun, J., concurring in part and concurring in the judgment). There, the Supreme Court upheld a $5,000 federal limit on individuals' contributions to multi-candidate PACs, reasoning,

> If the First Amendment rights of a contributor are not infringed by limitations on the amount he may contribute to a campaign organization which advocates the views and candidacy of a particular candidate, the rights of a contributor are similarly not impaired by limits on the amount he may give to a multi-candidate political committee .... which advocates the views and candidacies of a number of candidates.

*Cal–Med,* 453 U.S. at 197, 101 S.Ct. 2712 (plurality opinion).

Lower courts have repeatedly followed the Supreme Court's lead in upholding limits on contributions to PACs. *See, e.g., Kentucky Right to Life v. Terry,* 108 F.3d 637 (6th Cir.1997) (upholding $1500 aggregate annual limit on contributions by an individual to all permanent committees (equivalent to PACs)); *Florida Right to Life v. Mortham,* No. 98–770–Civ–Orl–19A, slip op. at 21 (M.D.Fla. March 20, 2000) (upholding $500 limit on contributions to political committees); *cf. Russell v. Burris,* 146 F.3d 563, 571 (8th Cir.1998) (implicitly acknowledging state's right to impose some limit on contributions to political committees, but invalidating limitation of $200 as too low); *Citizens for Responsible Government v. Buckley,* 60 F.Supp.2d 1066, 1088 (D.Colo.1999) (acknowledging that "the State has a compelling interest in limiting contributions to political committees, but holding that limit of $250 was too low").

Both *Buckley* and *Cal–Med* rejected the argument that limits on contributions to PACs are suspect because of the possibility that they might limit funds that the PAC could spend on matters other than political campaigns. " 'While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.' " *Cal–Med,* 453 U.S. at 197, 101 S.Ct. 2712 (plurality opinion) (quoting *Buckley,* 424 U.S. at 21, 96 S.Ct. 612). *Cf. Cal–Med,* 641 F.2d 619, 626 n. 5 (9th Cir.1980) (denying contention that the "effect of the limitation in restricting money spent by committees for independent expenditures, rather than candidate contributions, should be given serious consideration in evaluating the constitutionality of that limitation."), *aff'd,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981).

In terms of both underlying rationale and application, Act 64's limit on contributions to PACs is consistent with all of the limits that have already withstood constitutional challenge. It is therefore constitutional.

### b. Limits on Contributions from PACs to Candidates.

*Buckley* did not distinguish between individuals and PACs when it accepted the government's anti-corruption justification for FECA contribution limits. 424 U.S. at 38, 96 S.Ct. 612. Furthermore, Plaintiffs have offered no explanation for why PACs should be treated differently than individuals with regard to the amount that they should be allowed to contribute to political candidates. Indeed, the anti-corruption rationale that supports limits on individual contributions is arguably even stronger when applied to PAC contributions. As their name suggests, PACs exist in order to affect certain political action. The likelihood of actual *quid pro quo* arrangements between PACs and candidates is high; higher, perhaps, than for individual donors and candidates.

Additionally, limiting PAC contributions to candidates is consistent with the goal of deterring circumvention of the individual limits; without a limit on contributions from PACs individuals might well funnel money in excess of the individual limits to a given candidate.

Because the Supreme Court has not drawn a distinction between PAC contributions and individual contributions for the purposes of First Amendment Analysis, and because the potential for actual or perceived *quid pro quo* corruption of candidates is high with such contributions, Act 64's limits on PAC contributions to candidates do not violate the First Amendment.

### 6. Act 64's Limits on Related Expenditures, Vt.Stat.Ann. tit. 17, § 2809, Are Constitutional.

Section 2809 provides that related campaign expenditures made on a candidate's behalf shall be considered a contribution to the candidate and, if the related expenditure is over $50, it will also count as an expenditure by that candidate. Vt.Stat. Ann. tit. 17, §§ 2809(a) and (b). An expen-

diture by an individual is only considered related if it is "intended to promote the election of a specific candidate or group of candidates, or the defeat of an opposing candidate or group of candidates," and is "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee." Vt.Stat.Ann. tit. 17, § 2809(c). An expenditure made by a political party or by a political committee is presumed to be related if it primarily benefits six or fewer candidates who are associated with the party or committee. Vt.Stat.Ann. tit. 17, § 2809(d). The Secretary of State has determined that the presumption is rebuttable by appropriate evidence showing that the expenditure was not intentionally facilitated, solicited, or approved by the candidate.

Consistent with Act 64's regulation of party contributions and PAC contributions, this measure was designed to plug a loophole that would have allowed for circumvention of Act 64's individual contribution limits. Clearly, political candidates should not be able to evade campaign finance regulations simply by asking others to collect and spend money for them. This practice would foil the underlying motivation for the Act completely.

### a. Counting Related Expenditures as Contributions is Constitutional.

■ The Supreme Court has unequivocally stated that unrelated, or "independent," expenditures—regardless of whether they are made by people, PACs or political parties—may not be regulated. *Colorado Republican Campaign Committee v. FEC,* 518 U.S. 604, 618, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (the Constitu-

tion "grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures."); *see also FEC v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (striking down limit on independent expenditures by PACs); *Buckley,* 424 U.S. at 50, 96 S.Ct. 612 (striking down limit on independent expenditures by any "person"). "Coordinated," or "related" expenditures, on the other hand, can be regulated. *Buckley,* 424 U.S. at 36–37, 46–47, 96 S.Ct. 612.

> [i]f ... basic contribution limitations are constitutionally valid, then surely these provisions are a constitutionally acceptable accommodation of Congress' valid interest in encouraging citizen participation in political campaigns while continuing to guard against the corrupting potential of large financial contributions to candidates. The expenditure of resources at the candidate's direction ... provides material financial assistance to a candidate. The ultimate effect is the same as if the person had contributed the dollar amount to the candidate and the candidate had then used the contribution to pay for the fund raising event or the food.... Treating these expenses as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign.

*Id.* at 36–37, 96 S.Ct. 612.[27] In *Colorado Republican Campaign Committee v. FEC* a plurality of the Court confirmed this

---

**27.** The *Buckley* Court described the difference between coordinated and independent expenditures as follows:

> Section 608(b)'s contribution ceilings rather than 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions. By contrast, 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign.

> Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.
> 424 U.S. at 46–47, 96 S.Ct. 612.

understanding of *Buckley,* at least with regard to coordinated contributions of individuals and political committees. 518 U.S. at 624–25, 116 S.Ct. 2309.

Act 64's test for whether an expenditure is related is not vague. Under Act 64, expenditures are considered related only when such expenditures have been "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee." Persons wishing to make expenditures on their own to promote a candidate are completely free to do so in any amounts they desire. With such an explicit standard in place for differentiating between related and independent expenditures, individuals should be able to discern when they are acting in concert with a given candidate or candidate committee and when they are not.

With respect to the application of Section 2809 to PACs and political parties, there is no precedent to support Plaintiffs' argument that related expenditures by PACs and political parties should be entitled greater protection than related expenditures by individuals. Indeed, entitling them to such protection would create precisely the same potential for evasion of direct contribution limits that led the *Buckley* Court to uphold FECA's challenged limits on coordinated expenditures by individuals. *Buckley,* 424 U.S. at 36–37, 96 S.Ct. 612. To forbid, or even substantially loosen, regulation of party or PAC expenditures that are coordinated with candidates would undermine the purposes of Act 64.

Furthermore, this Court cannot agree with the 10th Circuit's novel ruling in *FEC v. Colorado Republican Federal Campaign Comm.,* 213 F.3d 1221 (10th Cir. May 5, 2000). A panel of the court held that Congress may not place any limits on coordinated expenditures made by political parties. *Id.* at 1223. The Tenth Circuit's holding violates the spirit of both *Buckley* and *Shrink.* In vigorous dissent, Chief Judge Seymour recognized this, pointing out that "the majority creat[ed] a special

category for political parties based on its view of their place in American politics, a view at odds with history and with legislation drafted by politicians." *Id.* at 1233. Chief Judge Seymour further opined that "the majority has substituted a paean to its view of the role of political parties for a properly deferential assessment of the constitutionality of limits on coordinated party contributions under applicable Supreme Court authority." *Id.* at 1244.

The majority opinion rejected exactly the type of evidence found to be sufficient in *Shrink* concerning the potential for corruption, and imposed its own view that political parties do not pose any danger of corruption. *Id.* at 1223. *Shrink* directly rejected the contention that government may not act to regulate campaign finance practices absent *quid pro quo* corruption: "In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Shrink,* 120 S.Ct. at 905 (quoting *Buckley,* 424 U.S. at 27, 96 S.Ct. 612). In the current case, this Court has been presented with precisely the evidence accepted by the *Shrink* Court and rejected by the Tenth Circuit in *FEC v. Colorado Republican*—trial testimony from would-be and actual politicians, as well as expert empirical analysis demonstrating the influence donors have on politicians.

For these reasons Act 64's requirement that related expenditures by political parties, PACs and individuals be counted as contributions to the candidates they help is constitutional.

It should be noted that as a result of this holding, related expenditures so defined by Section 2809 will also be subject to the $200, $300, and $400 contribution limits imposed on individuals and PACs by Section 2805(a).

### b. Counting Related Expenditures as Candidate Expenditures is Unconstitutional.

██ The Court has already ruled above that regulating the expenditures of candidates is unconstitutional. Therefore, Section 2809(b), which states that if the related expenditure is over $50 it counts as an expenditure by that candidate, is unconstitutional as well.

### c. The Rebuttable Presumption, Vt.Stat.Ann. tit. 17, § 2809(d), is constitutional.

██ Section 2809(d) provides that if an expenditure is made by a political party or political committee and supports six or fewer candidates, a presumption is triggered that it is a related expenditure under Act 64. Plaintiffs argue that this presumption is a content-based restriction of speech aimed at discouraging advertisements that are devoted to a small number of candidates, and that as such, it violates the First Amendment.

The Administrative Rule promulgated by the Secretary of State pursuant to the authority granted under Section 2809(f), however, explicitly states that, even with respect to a party or political expenditure targeted to six or fewer candidates, the presumption is rebuttable by appropriate evidence showing that the expenditure was not intentionally facilitated, solicited, or approved by the candidate(s). The Administrative Rule is consistent with the legislative history of Act 64, which shows that the presumption was, at all times, intended to be rebuttable.[28]

Section 2809(d) thus provides nothing more than a guideline to assist in compliance with the statute by political parties and political committees. As such, it is not an impermissible restriction on Plaintiffs'

First Amendment rights. In fact, it specifically draws the line between expenditures that can be constitutionally regulated, and those that cannot. It is therefore constitutional.

### C. Severability

Vermont law provides that "[T]he provisions of any act are severable. If any provision of an act is invalid, or if any application thereof to any person or circumstance is invalid, the invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or applications." Vt.Stat. Ann. tit. 1, § 215. Plaintiffs have challenged certain parts of Act 64, not the entire law.

██ Each challenged provision has been examined separately. According to Vermont law, a court must sever only the unconstitutional feature, phrase, or word of a statute leaving the remainder of the statute as an operative whole. Whenever possible, "[t]he unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Veilleux v. Springer*, 131 Vt. 33, 41, 300 A.2d 620, 625 (Vt.1973) (quoting *United States v. Jackson*, 390 U.S. 570, 585–86, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (striking unconstitutional penalty provision from statute)); *see also Bagley v. Vermont Dept. of Taxes*, 146 Vt. 120, 500 A.2d 223, 226 (1985) (severing unconstitutional phrase from otherwise valid statute because court concluded that legislature would have enacted law even if it had lacked the unconstitutional provision); *State v. Stevens*, 137 Vt. 473, 408 A.2d 622

---

28. Representative Terry Bouricius, who sponsored the amendment creating a presumption for expenditures by parties or political committees on behalf of six or fewer candidates, made it clear that this presumption is not conclusive, but rebuttable. Bouricius explained, "you can rebut the presumption. . . . So it's not an absolute." Bouricius also testified that expenditures on behalf of six or fewer candidates were more likely to be part of the campaign.

(1979) (striking word from statute as being unconstitutionally vague in order to effectuate the legislative intent).

■ Accordingly, the Court concludes that the unconstitutional sections—Vt.Stat. Ann. tit. 17, §§ 2805(a) and (b) in part, § 2805(c), 2805a(a), and 2809 in part—may be, and are, in accordance with this opinion, severed from the remainder of Act 64.

### III. *CONCLUSION*

Free speech and association are among most revered pillars of our democratic society. In the words of Justice Louis Brandeis: "freedom to think as you will and speak as you think are means indispensable to the discovery and spread of political truth; ... public discussion is a political duty; and ... this should be a fundamental principle of the American government." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). "Virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley,* 424 U.S. at 19, 96 S.Ct. 612. Restrictions on the amount of money people or groups can spend on political advocacy therefore necessarily reduce the quantity and effectiveness of their expression. *Id.* The exercise of those freedoms by some through large money contributions in our political system threatens to drown out the freedoms of speech and association of so many others—those who cannot make such large contributions. The integrity of our democracy is inextricably bound to the voices of those with lesser means. Thus, the categorical preservation of free speech and association cannot lay waste to our other core democratic values such as effective representation, equal access to the political system, and honest, responsive government.

Act 64 represents a thorough, effective, and—with the exception of expenditure limits, out-of-state contribution limits, and limits on party contributions to candidates—entirely constitutional attempt by the Vermont legislature to address the real-world problem of excessive money in politics while keeping inside the philosophical dictates of *Buckley.* Today, this Court has upheld the Act to the furthest extent that the First Amendment will allow.

Wherefore, the Court rules as follows:

1. Act 64's contribution limits to candidates, Vt.Stat.Ann. tit. 17, § 2805(a)–(b), are constitutional as they pertain to individuals.

2. Act 64's expenditure limits, Vt.Stat. Ann. tit. 17, § 2805a(a), are unconstitutional.

3. Act 64's 25% limit on out-of-state funds, Vt.Stat.Ann. tit. 17, § 2805(c), is unconstitutional.

4. Act 64's $2000 limit on contributions to political parties, Vt.Stat.Ann. tit. 17, § 2805(a)–(b), is constitutional. However, the limit on contributions *from* political parties to candidates, codified at same, is unconstitutionally low. Act 64's definition of state and local parties as one entity pursuant to Vt.Stat.Ann. tit. 17, §§ 2801(5), and 2301 through 2320, is constitutional.

5. Act 64's $2,000 limit on contributions to political committees, and its various limits on contributions by political committees to candidates, Vt.Stat.Ann. tit. 17, § 2805(a)–(b), is constitutional.

6. Act 64's regulation of related expenditures, Vt.Stat.Ann. tit. 17, § 2809(a)–(c), is constitutional as it relates to candidate contributions, but unconstitutional as it relates to candidate expenditures. Additionally, Section 2809(d)'s establishment of a rebuttable presumption that an expenditure by a political party or political committee is related if it benefits six or fewer candidates, as clarified by the Secretary of State, is constitutional.

7. Defendants are herewith enjoined from enforcing the unconstitutional provisions mentioned above against Plaintiffs.