Justice Stevens,
dissenting.
Justice Breyer and Justice Souter debate whether the per curiam decision in Buckley v. Valeo, 424 U. S. 1 (1976), forecloses any constitutional limitations on candidate expenditures. This is plainly an issue on which reasonable minds can disagree. The Buckley Court never explicitly ad *274 dressed whether the pernicious effects of endless fundraising can serve as a compelling state interest that justifies expenditure limits, post, at 282 (Souter, J., dissenting), yet its silence, in light of the record before it, suggests that it implicitly treated this proposed interest insufficient, ante, at 245-246 (plurality opinion of Breyer, J.). Assuming this to be true, however, I am convinced that Buckley’s holding on expenditure limits is wrong, and that the time has come to overrule it.
I have not reached this conclusion lightly. As Justice Breyer correctly observes, stare decisis is a principle of “'fundamental importance.’” Ante, at 243. But it is not an inexorable command, and several factors, taken together, provide special justification for revisiting the constitutionality of statutory limits on candidate expenditures.
To begin with, Buckley’s holding on expenditure limits itself upset a long-established practice. For the preceding 65 years, congressional races had been subject to statutory limits on both expenditures and contributions. See Act of Aug. 19, 1911, ch. 33, 37 Stat. 28; Federal Corrupt Practices Act of 1925, 43 Stat. 1073; Federal Election Campaign Finance Act of 1971, 86 Stat. 5; Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263; United States v. Automobile Workers, 352 U. S. 567, 575-576 (1957); McConnell v. Federal Election Comm’n, 540 U. S. 93, 115-117 (2003). As the Court of Appeals had recognized in Buckley v. Valeo, 519 F. 2d 821, 859 (CADC 1975) (en banc) (per curiam), our earlier jurisprudence provided solid support for treating these limits as permissible regulations of conduct rather than speech. Ibid, (discussing Burroughs v. United States, 290 U. S. 534 (1934), and United States v. Harriss, 347 U. S. 612 (1954)); see also 519 F. 2d, at 841, and n. 41, 851, and n. 68. While Buckley’s holding on contribution limits was consistent with this backdrop, its holding on expenditure limits “involve[d] collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience,” Helvering v. Hallock, 309 U. S. 106, 119 (1940).
*275 There are further reasons for reexamining Buckley’s holding on candidate expenditure limits that do not apply to its holding on candidate contribution limits. Although we have subsequently reiterated the line Buckley drew between these two types of limits, we have done so primarily in cases affirming the validity of contribution limits or their functional equivalents. See McConnell, 540 U. S., at 134-138; Federal Election Comm’n v. Colorado Republican Federal Campaign Comm., 533 U. S. 431, 440-442 (2001); Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 386-387 (2000); cf. California Medical Assn. v. Federal Election Comm’n, 453 U. S. 182, 194-195 (1981) (plurality opinion). In contrast, these are our first post-Buckley cases that raise the constitutionality of expenditure limits on the amounts that candidates for office may spend on their own campaigns.[1]
Accordingly, while we have explicitly recognized the importance of stare decisis in the context of Buckley’s holding on contribution limits, McConnell, 540 U. S., at 137-138, we have never before done so with regard to its rejection of expenditure limits. And McConnell’s recognition rested largely on an interest specific to Buckley’s holding on contribution limits. There, we stated that “[cjonsiderations. of stare decisis, buttressed by the respect that the Legislative and Judicial Branches owe to one another, provide additional powerful reasons for adhering to the analysis of contribution limits that the Court has consistently followed since Buckley was decided.” 540 U. S., at 137-138 (emphasis added). This powerful buttress is absent from Buckley’s re *276 fusal to defer to the Legislature’s judgment as to the importance of expenditure limits. Relatedly, while Congress and state legislatures have long relied on Buckley’s authorization of contribution limits, Buckley’s rejection of expenditure limits “has not induced [comparable] detrimental reliance,” Lawrence v. Texas, 539 U. S. 558, 577 (2003). See also Vieth v. Jubelirer, 541 U. S. 267, 306 (2004) (plurality opinion) (noting lessened stare decisis concern where “it is hard to imagine how any action taken in reliance upon [the prior case] could conceivably be frustrated”).
Perhaps in partial recognition of these points, Justice White refused to abandon his opposition to Buckley’s holding on expenditure limits. See Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U. S. 238, 271 (1986); Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480, 507-512 (1985) (dissenting opinion). He believed Buckley deeply wrong on this issue because it confused “the identification of speech with its antecedents.” National Conservative Political Action Comm., 470 U. S., at 508. Over the course of his steadfast campaign, he converted at least one other Buckley participant to this position, see National Conservative Political Action Comm., 470 U. S., at 518-521 (Marshall, J., dissenting), and his reasoning has since persuaded me—the nonparticipating Member of the Buckley Court—as well.
As Justice White recognized, it is quite wrong to equate money and speech. Buckley, 424 U. S., at 263 (opinion concurring in part and dissenting in part). To the contrary:
“The burden on actual speech imposed by limitations on the spending of money is minimal and indirect. All rights of direct political expression and advocacy are retained. Even under the campaign laws as originally enacted, everyone was free to spend as much as they chose to amplify their views on general political issues, just not specific candidates. The restrictions, to the ex *277 tent they do affect speech, are viewpoint-neutral and indicate no hostility to the speech itself or its effects.” National Conservative Political Action Comm., 470 U. S., at 508-509 (White, J., dissenting).
Accordingly, these limits on expenditures are far more akin to time, place, and manner restrictions than to restrictions on the content of speech. Like Justice White, I would uphold them “so long as the purposes they serve are legitimate and sufficiently substantial.” Buckley, 424 U. S., at 264.
Buckley's conclusion to the contrary relied on the following oft-quoted metaphor:
' “Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline.” Id., at 19, n. 18.
But, of course, while a car cannot run without fuel, a candidate can speak without spending money. And while a car can only travel so many miles per gallon, there is no limit on the number of speeches or interviews a candidate may give on a limited budget. Moreover, provided that this budget is above a certain threshold, a candidate can exercise due care to ensure that her message reaches all voters. Just as a driver need not use a Hummer to reach her destination, so a candidate need not flood the airways with ceaseless soundbites of trivial information in order to provide voters with reasons to support her.
Indeed, the examples of effective speech in the political arena that did not depend on any significant expenditure by the campaigner are legion. It was the content of William Jennings Bryan’s comments on the “Cross of Gold”—and William McKinley’s responses delivered from his front porch in Canton, Ohio—rather than any expenditure of money that appealed to their cost-free audiences. Neither Abraham Lincoln nor John F. Kennedy paid for the opportunity to engage in the debates with Stephen Douglas and Richard *278 Nixon that may well have determined the outcomes of Presidential elections. When the seasoned campaigners who were Members of the Congress that endorsed the expenditure limits in the Federal Election Campaign Act Amendments of 1974 concluded that a modest budget would not preclude them from effectively communicating with the electorate, they necessarily rejected the Buckley metaphor.
These campaigners also identified significant government interests favoring the imposition of expenditure limits. Not only do these limits serve as an important complement to corruption-reducing contribution limits, see id., at 264 (opinion of White, J.), but they also “protect equal access to the political arena, [and] free candidates and their staffs from the interminable burden of fundraising.” Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 649-650 (1996) (Stevens, J., dissenting). These last two interests are particularly acute. When campaign costs are so high that only the rich have the reach to throw their hats into the ring, we fail “to protect the political process from undue influence of large aggregations of capital and to promote individual responsibility for democratic government.” Automobile Workers, 352 U. S., at 590. States have recognized this problem,[2] but Buckley’s perceived ban on expenditure limits severely limits their options in dealing with it.
The interest in freeing candidates from the fundraising strait jacket is even more compelling. Without expenditure limits, fundraising devours the time and attention of political leaders, leaving them-too busy to handle their public responsibilities effectively. That fact was well recognized by backers of the legislation reviewed in Buckley, by the Court of Appeals judges who voted to uphold the expenditure limitations in that statute, and by Justice White—who not inciden *279 tally had personal experience as an active participant in a Presidential campaign. Cf. 519 F. 2d, at 838 (and citations to legislative history contained therein); 424 U. S., at 265 (opinion of White, J.). The validity of their judgment has surely been confirmed by the mountains of evidence that has been accumulated in recent years concerning the time that elected officials spend raising money for future campaigns and the adverse effect of fundraising on the performance of their official duties.[3]
Additionally, there is no convincing evidence that these important interests favoring expenditure limits are fronts for incumbency protection. Buckley’s cursory suggestion to the contrary, id., at 56-57, failed to take into account the mixed evidence before it on this issue. See 519 F. 2d, at 861, 862 (detailing how “[t]he material available to the court looks both ways”). And only by “permitting] States nationwide to experiment with these critically-needed reforms”—as 18 States urge us to do—will we enable further research on how expenditure limits relate to our incumbent reeleetion rates. See Brief for State of Connecticut et al. as Amici Curiae 3.[4] In the meantime, a legislative judgment that “enough is *280 enough” should command the greatest possible deference from judges interpreting a constitutional provision that, at best, has an indirect relationship to activity that affects the quantity—rather than the quality or the content—of repetitive speech in the marketplace of ideas.
One final point bears mention. Neither the opinions in Buckley nor those that form today’s cacophony pay heed to how the Framers would have viewed candidate expenditure limits. This is not an unprincipled approach, as the historical context is “usually relevant but not necessarily dispositive.” Georgia v. Randolph, 547 U. S. 103, 123 (2006) (Stevens, J., concurring). This is particularly true of contexts that are so different. At the time of the framing the accepted posture of the leading candidates was one of modesty, acknowledging a willingness to serve rather than a desire to compete. Speculation about how the Framers would have legislated if they had foreseen the era of televised soundbites thus cannot provide us with definitive answers.
Nevertheless, I am firmly persuaded that the Framers would have been appalled by the impact of modern fund-raising practices on the ability of elected officials to perform their public responsibilities. I think they would have viewed federal statutes limiting the amount of money that congressional candidates might spend in future elections as well within Congress’ authority.[5] And they surely would *281 not have expected judges to interfere with the enforcement of expenditure limits that merely require candidates to budget their activities without imposing any restrictions whatsoever on what they may say in their speeches, debates, and interviews.
For the foregoing reasons, I agree with Justice Souter that it would be entirely appropriate to allow further proceedings on expenditure limits to go forward in these cases. For the reasons given in Parts II and III of his dissent, I also agree that Vermont’s contribution limits and presumption of coordinated expenditures by political parties are constitutional, and so join those portions of his opinion.
Justice Souter, with whom Justice Ginsburg joins, and with whom Justice Stevens joins as to Parts II and III, dissenting.
In 1997, the Legislature of Vermont passed Act 64 after a series of public hearings persuaded legislators that rehabilitating the State’s political process required campaign finance reform. A majority of the Court today decides that the expenditure and contribution limits enacted are irreconcilable with the Constitution’s guarantee of free speech. I would adhere to the Court of Appeals’s decision to remand for further enquiry bearing on the limitations on candidates’ expenditures, and I think the contribution limits satisfy controlling precedent. I respectfully dissent.
I
Rejecting Act 64’s expenditure limits as directly contravening Buckley v. Valeo, 424 U. S. 1 (1976) (per curiam), ante, at 242-246 (opinion of Breyer, J.), is at least premature.
We said in Buckley that “expenditure limitations impose far greater restraints on the freedom of speech and association than do . . . contribution limitations,” 424 U. S., at 44, but the Buckley Court did not categorically foreclose the possibility that some spending limit might comport with the *282 First Amendment. Instead, Buckley held that the constitutionality of an expenditure limitation “turns on whether the governmental interests advanced in its support satisfy the [applicable] exacting scrutiny.” Ibid. In applying that standard in Buckley itself, the Court gave no indication that it had given serious consideration to an aim that Vermont’s statute now pursues: to alleviate the drain on candidates’ and officials’ time caused by the endless fundraising necessary to aggregate many small contributions to meet the opportunities for ever more expensive campaigning. Instead, we dwelt on rejecting the sufficiency of interests in reducing corruption, equalizing the financial resources of candidates, and capping the overall cost of political campaigns, see id., at 55-57. Although Justice White went a step further in dissenting from the Court on expenditures, and made something of the interest in getting officials off the “treadmill” driven by the “obsession with fundraising,” see id., at 265 (opinion concurring in part and dissenting in part), this lurking issue was not treated as significant on the expenditure question in the per curiam opinion. Whatever the observations made to the Buckley Court about the effect of fundraising on candidates’ time, the Court did not squarely address a time-protection interest as support for the expenditure limits, much less one buttressed by as thorough a record as we have here.*
*283 Vermont’s argument therefore does not ask us to overrule Buckley; it asks us to apply Buckley’s framework to determine whether its evidence here on a need to slow the fund-raising treadmill suffices to support the enacted limitations. Vermont’s claim is serious. Three decades of experience since Buckley have taught us much, and the findings made by the Vermont Legislature on the pernicious effect of the nonstop pursuit of money are significant. See, e. g., Act 64, H. 28, Legislative Findings and Intent, App. 20 (hereinafter Legislative Findings) (finding that “candidates for statewide offices are spending inordinate amounts of time raising campaign funds”); ibid, (finding that “[rjobust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have increased”); see also Landell v. Sorrell, 118 F. Supp. 2d 459, 467 (Vt. 2000) (noting testimony of Sen. Shumlin before the legislature that raising funds “was one of the most distasteful things that I’ve had to do in public service” (internal quotation marks omitted)); Landell v. Sorrell, 382 F. 3d 91, 123 (CA2 2004) (public officials testified at trial that “elected officials spend time with donors rather than on their official duties”).
The legislature’s findings are surely significant enough to justify the Court of Appeals’s remand to the District Court to decide whether Vermont’s spending limits are the least restrictive means of accomplishing what the court unexceptionably found to be worthy objectives. See id., at 124-125, 135-137. The District Court was instructed to examine a variety of outstanding issues, including alternatives considered by Vermont’s Legislature and the reasons for rejecting them. See id., at 136. Thus, the constitutionality of the expenditure limits was not conclusively decided by the Second Circuit, and I believe the evidentiary work that remained to be done would have raised the prospect for a sound answer to that question, whatever the answer might have been. In *284 stead, we are left with an unresolved question of narrow tailoring and with consequent doubt about the justifiability of the spending limits as necessary and appropriate correctives. This is not the record on which to foreclose the ability of a State to remedy the impact of the money chase on the democratic process. I would not, therefore, disturb the Court of Appeals’s stated intention to remand.
II
Although I would defer judgment on the merits of the expenditure limitations, I believe the Court of Appeals correctly rejected the challenge to the contribution limits. Low though they are, one cannot say that “the contribution limitation^ are] so radical in effect as to render political association ineffective, drive the sound of a candidate’s voice below the level of notice, and render contributions pointless.” Nixon v. Shrink Missouri Government PAC, 528 U. S. 877, 397 (2000).
The limits set by Vermont are not remarkable departures either from those previously upheld by this Court or from those lately adopted by other States. The plurality concedes that on a per-citizen measurement Vermont’s limit for statewide elections “is slightly more generous,” ante, at 251, than the one set by the Missouri statute approved by this Court in Shrink, supra. Not only do those dollar amounts get more generous the smaller the district, they are consistent with limits set by the legislatures of many other States, all of them with populations larger than Vermont’s, some significantly so. See, e. g., Montana Right to Life Assn. v. Eddleman, 343 F. 3d 1085, 1088 (CA9 2003) (approving $400 limit for candidates filed jointly for Governor and Lieutenant Governor, since increased to $500, see Mont. Code Ann. § 13-37-216(l)(a)(i) (2005)); Daggett v. Commission on Governmental Ethics and Election Practices, 205 F. 3d 445, 452 (CA1 2000) ($500 limit for gubernatorial candidates in *285 Maine); Minnesota Citizens Concerned for Life, Inc. v. Kelley, 427 F. 3d 1106, 1113 (CA8 2005) ($500 limit on contributions to legislative candidates in election years, $100 in other years); Florida Right to Life, Inc. v. Mortham, No. 6:98-770-CV.ORL-19A, 2000 WL 33733256, *3 (MD Fla., Mar. 20, 2000) ($500 limit on contributions to any state candidate). The point is not that this Court is bound by judicial sanctions of those numbers; it is that the consistency in legislative judgment tells us that Vermont is not an eccentric party of one, and that this is a case for the judicial deference that our own precedents say we owe here. See Shrink, supra, at 402 (Breyer, J., concurring) (“Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments”); see also ante, at 248 (plurality opinion) (“[Ojrdinarily we have deferred to the legislature’s determination of [matters related to the costs and nature of running for office]”).
To place Vermont’s contribution limits beyond the constitutional pale, therefore, is to forget not only the facts of Shrink, but also our self-admonition against second-guessing legislative judgments about the risk of corruption to which contribution limits have to be fitted. See Shrink, supra, at 391, and n. 5. And deference here would surely not be overly complaisant. Vermont’s legislators themselves testified at length about the money that gets their special attention, see Legislative Findings, App. 20 (finding that “[s]ome candidates and elected officials, particularly when time is limited, respond and give access to contributors who make large contributions in preference to those who make small or no contributions”); 382 F. 3d, at 122 (testimony of Elizabeth Ready: “If I have only got an hour at night when I get home to return calls, I am much more likely to return [a donor’s] call than I would [a non-donor’s].... [W]hen you only have a few minutes to talk, there are certain people that get access” (alterations in original)). The record revealed the *286 amount of money the public sees as suspiciously large, see 118 F. Supp. 2d, at 479-480 (“The limits set by the legislature . . . accurately reflect the level of contribution considered suspiciously large by the Vermont public. Testimony suggested that amounts greater than the contribution limits are considered large by the Vermont public”). And testimony identified the amounts high enough to pay for effective campaigning in a State where the cost of running tends to be on the low side, see id., at 471 (“In the context of Vermont politics, $200, $300, and $400 donations are clearly large, as the legislature determined. Small donations are considered to be strong acts of political support in this state. William Meub testified that a contribution of $1 is meaningful because it represents a commitment by the contributor that is likely to become a vote for the candidate. Gubernatorial candidate Ruth Dwyer values the small contributions of $5 so much that she personally sends thank you notes to those donors”); id., at 470-471 (“In Vermont, many politicians have run effective and winning campaigns with very little money, and some with no money at all.... Several candidates, campaign managers, and past and present government officials testified that they will be able to raise enough money to mount effective campaigns in the system of contribution limits established by Act 64”); id., at 472 (“Spending in Vermont statewide elections is very low .... Vermont ranks 49th out of the 50 states in campaign spending. The majority of major party candidates for statewide office in the last three election cycles spent less than what the spending limits of Act 64 would allow.... In Vermont legislative races, low-cost methods such as door-to-door campaigning are standard and even expected by the voters”).
Still, our cases do not say deference should be absolute. We can all imagine dollar limits that would be laughable, and per capita comparisons that would be meaningless because aggregated donations simply could not sustain effective campaigns. The plurality thinks that point has been reached in *287 Vermont, and in particular that the low contribution limits threaten the ability of challengers to run effective races against incumbents. Thus, the plurality’s limit of deference is substantially a function of suspicion that political incumbents in the legislature set low contribution limits because their public recognition and easy access to free publicity will effectively augment their own spending power beyond anything a challenger can muster. The suspicion is, in other words, that incumbents cannot be trusted to set fair limits, because facially neutral limits do not in fact give challengers an even break. But this received suspicion is itself a proper subject of suspicion. The petitioners offered, and the plurality invokes, no evidence that the risk of a pro-incumbent advantage has been realized; in fact, the record evidence runs the other way, as the plurality concedes. See ante, at 256 (“[T]he record does contain some anecdotal evidence supporting the respondents’ position, namely, testimony about a post-Act-64 competitive mayoral campaign in Burlington, which suggests that a challenger can ‘amas[s] the resources necessary for effective advocacy,’ Buckley, 424 U. S., at 21”). I would not discount such evidence that these low limits are fair to challengers, for the experience of the Burlington race is confirmed by recent empirical studies addressing this issue of incumbent’s advantage. See, e. g., Eom & Gross, Contribution Limits and Disparity in Contributions Between Gubernatorial Candidates, 59 Pol. Research Q. 99 (2006) (“Analyses of both the number of contributors and the dollar amount of contributions [to gubernatorial candidates] suggest no support for an increased bias in favor of incumbents resulting from the presence of campaign contribution limits. If anything, contribution limits can work to reduce the bias that traditionally works in favor of incumbents. Also, contribution limits do not seem to increase disparities between gubernatorial candidates in general” (emphasis deleted)); Bardwell, Money and Challenger Emergence in Gubernatorial Primaries, 55 Pol. Research Q. 653 (2002) (finding that *288 contribution limits favor neither incumbents nor challengers); Hogan, The Costs of Representation in State Legislatures: Explaining Variations in Campaign Spending, 81 Soc. Sci. Q. 941, 952 (2000) (finding that contribution limits reduce incumbent spending but have no effect on challenger or open-seat candidate spending). The Legislature of Vermont evidently tried to account for the realities of campaigning in Vermont, and I see no evidence of constitutional miscalculation sufficient to dispense with respect for its judgments.
Ill
Four issues of detail call for some attention, the first being the requirement that a volunteer’s expenses count against the person’s contribution limit. The plurality certainly makes out the case that accounting for these expenses will be a colossal nuisance, but there is no case here that the nuisance will noticeably limit volunteering, or that volunteers whose expenses reach the limit cannot continue with their efforts subject to charging their candidates for the excess. Granted, if the provisions for contribution limits were teetering on the edge of unconstitutionality, Act 64’s treatment of volunteers’ expenses might be the finger-flick that gives the fatal push, but it has no greater significance than that.
Second, the failure of the Vermont law to index its limits for inflation is even less important. This challenge is to the law as it is, not to a law that may have a different impact after future inflation if the state legislature fails to bring it up to economic date.
Third, subjecting political parties to the same contribution limits as individuals does not condemn the Vermont scheme. What we said in Federal Election Comm’n v. Colorado Republican Federal Campaign Comm., 533 U. S. 431, 454-455 (2001), dealing with regulation of coordinated expenditures, goes here, too. The capacity and desire of parties to make large contributions to competitive candidates with uphill *289 fights are shared by rich individuals, and the risk that large party contributions would be channels to evade individual limits cannot be eliminated. Nor are these reasons to support the party limits undercut by claims that the restrictions render parties impotent, for the parties are not precluded from uncoordinated spending to benefit their candidates. That said, I acknowledge the suggestions in the petitioners’ briefs that such restrictions in synergy with other influences weakening party power would justify a wholesale reexamination of the situation of party organization today. But whether such a comprehensive reexamination belongs in courts or only in legislatures is not an issue presented by these cases.
Finally, there is the issue of Act 64’s presumption of coordinated expenditures on the part of political parties, Vt. Stat. Ann., Tit. 17, § 2809(d) (2002). The plurality has no occasion to reach it; I do reach it, but find it insignificant. The Republican Party petitioners complain that the related expenditure provision imposes on both the candidate and the party the burden in some circumstances to prove that coordination of expenditure did not take place, thus threatening to charge against a candidate’s spending limits some party expenditures that are in fact independent, with an ultimate consequence of chilling speech. See Brief for Petitioner Vermont Republican State Committee et al. 45-46. On the contrary, however, we can safely take the presumption on the representation to this Court by the Attorney General of Vermont: the law imposes not a burden of persuasion but merely one of production, leaving the presumption easily rebuttable. See Tr. of Oral Arg. 39-41 (representation that the presumption disappears once credible evidence, such as an affidavit, is offered); see also Brief for Respondent/Cross-Petitioner William H. Sorrell et al. 48 (The presumption “contributes no evidence and disappears when facts appear. In a case covered by the presumption, a political party need only present some evidence that the presumed fact is not true and *290 the presumption vanishes. . . . Simple testimony that the expenditure was not coordinated would suffice to defeat the presumption” (citations, internal quotation marks, and alterations omitted)). As so understood, the rebuttable presumption clearly imposes no onerous burden like the conclusive presumption in Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 619 (1996) (principal opinion), or the nearly conclusive one in Riley v. National Federation of Blind of N. C., Inc., 487 U. S. 781, 785-786 (1988). Requiring the party in possession of the pertinent facts to come forward with them, as easily as by executing an affidavit, does not rise to the level of a constitutionally offensive encumbrance here. Cf. County Court of Ulster Cty. v. Allen, 442 U. S. 140, 158, n. 16 (1979) (“To the extent that a presumption imposes an extremely low burden of production—e. g., being satisfied by ‘any’ evidence— it may well be that its impact is no greater than that of a permissive inference”).
IV
Because I would not pass upon the constitutionality of Vermont’s expenditure limits prior to further enquiry into their fit with the problem of fundraising demands on candidates, and because I do not see the contribution limits as depressed to the level of political inaudibility, I respectfully dissent.

 We have, of course, invalidated limits on independent expenditures by third persons. Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480 (1985); Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604 (1996); cf. Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U. S. 238 (1986). In these cases the principal parties accepted Buckley’s holding on candidate expenditure limits and gave us no cause to consider how much weight to give stare decisis.

 See Brief for State of Connecticut et al. as Amici Curiae 16-17 (citing Ariz. Rev. Stat. § 16-940(B)(7); Colo. Rev. Stat. § 1-45-102; Neb. Rev. Stat. §32-1602(1); and R. I. Gen. Laws § 17-25-18).

 See, e. g., Alexander, Let Them Do Their Jobs: The Compelling Government Interest in Protecting the Time of Candidates and Elected Officials, 37 Loyola U. Chi. L. J. 669, 673-683 (2006); see also post, at 283 (Souter, J., dissenting).

 Indeed, the example of the city of Albuquerque suggests that concerns about incumbent entrenchment are unfounded. In 1974, the city set expenditure limits on municipal elections. A 2-year interlude aside, these limits applied until 2001, when they were successfully challenged by municipal candidates. Homans v. Albuquerque, 217 F. Supp. 2d 1197, 1200 (NM 2002), aff’d, 366 F. 3d 900 (CA10), cert. denied, 543 U. S. 1002 (2004). In its findings of fact, the Federal District Court determined that “[Nationwide, eighty-eight percent (88%) of incumbent Mayors successfully sought reeleetion in 1999. In contrast, since 1974, the City has had a zero percent (0%) success rate for Mayors seeking reeleetion.” 217 F Supp. 2d, at 1200 (citation omitted). The court further concluded that the “system of uNimited spending has deleterious effects on the competitiveness of elections because it gives incumbent candidates an electoral advan *280 tage.” Ibid. While far from conclusive, this example cuts against the view that there is a slam-dunk correlation between expenditure limits and incumbent advantage. See also Brief for Center for Democracy and Election Management at American University as Amicus Curiae (concluding that Canada, the United Kingdom, New Zealand, and Malta—all of which have campaign expenditure limits—have more electoral competition than the United States, Jamaica, Ireland, and Australia—all of which lack such limits).

 See Art. I, §4 (providing that the “Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations”); see also §5 (providing that “Each House may determine the Rules of its Proceedings”).

In approving the public funding provisions of the subject campaign finance law, Subtitle H of the Internal Revenue Code, the Buckley Court appreciated that in enacting the provision Congress was legislating in part “to free candidates from the rigors of fundraising,” 424 U. S., at 91; see also id., at 96 (“Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions”). Recognition of the interest as to Subtitle H, a question of congressional power involving a different evidentiary burden, see South Dakota v. Dole, 483 U. S. 203, 207 (1987); see also Buckley, supra, at 90, does not imply a conclusive rejection of it as to the separate issue of expenditure limits.